**A. L. GREER and Ruth E. Greer et al.,**
**Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

**No. 20483.**

United States Court of Appeals
Fifth Circuit.

July 8, 1964.

Wentworth T. Durant, Ronald M. Mankoff, Dallas, Tex., Robert Edwin Davis, Dallas, Tex., Durant, Mankoff & Davis, Dallas, Tex., of counsel, for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Crane C. Hauser, Chief Counsel, IRS, John M. Morawski, Atty., IRS, Melva M. Graney, Stephen B. Wolfberg, Crombie J. D. Garrett, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before BROWN, WISDOM and BELL, Circuit Judges.

BELL, Circuit Judge:

This matter arises out of a petition to review a Tax Court decision upholding deficiency assessments.[1] The question presented turns on whether business expenses, admittedly deductible, accrued to petitioners as losses from a joint venture, or to a corporation, Oscura Company, Inc., the wholly owned subsidiary of another corporation, United Minerals, Inc., in which petitioners and their fellow venturers were the sole stockholders.

It is undisputed that the expenses were incurred by the subsidiary, Oscura Company, Inc., in the development and operation of a lead mine in Socorro County, New Mexico. Petitioners contend that Oscura was their agent, and that the expenses were for their account. They also contend that the expenses necessarily accrued to them under the circumstances because of their ownership of the minerals being mined. The burden was on petitioners to show that the expenses were theirs and not those of Oscura, and we affirm the holding of the Tax Court to the contrary.

Oscura Company, Inc., a New Mexico corporation, was organized in October, 1955 to construct and operate a lead mine on a leasehold which had previously been acquired by W. B. Hogg and petitioner A. L. Greer. It had paid in capital of $2,000. The funds to acquire the lease, for the capitalization of Oscura, and for initial expenditures under the lease came from Strategic Minerals, Inc., a Delaware Corporation, in which Hogg and Greer were stockholders. These funds were advanced for the accounts of Hogg and Greer as there were other stockholders in Strategic who were not interested in the venture. However, the stock ownership in Oscura was vested in Strategic. Taxwise, the expenditures on the venture during this period were treated as those of Greer and Hogg.

Needing further funds to develop the lease and project, Greer and Hogg entered into a contract on December 21, 1955, with W. W. Dyer and Fletcher G. Lippitt, Jr., which resulted in the formation of United Minerals, Inc., a Delaware corporation, with paid in capital of $1,000 and stock ownership vested pro rata in the four, Hogg, Lippitt, and petitioners Greer and Dyer.[2]

The next day United purchased all of the outstanding capital stock of Oscura from Strategic, and the notes and obligations which Greer and Hogg had personally incurred in initiating and carrying on the venture up to that time. The contract between the four parties relative to forming United, and to subsequent business endeavors to be undertaken, some of which were not related to the mining operation specified that

---

[1] T. C. Memo 1962–182. The Greer tax returns involved are for the years 1955, 1956 and 1957 while the Dyer returns are for the years 1956 and 1957. The wives are parties only because of joint returns.

[2] Hogg was not a party in the Tax Court. Lippitt was a party there but is not a party to this appeal.

United was to acquire the leasehold from Greer and Hogg. This did not prove to be the case since the leasehold was never conveyed to United. Instead, Greer and Hogg, on May 7, 1956, assigned one half of their interest in the leasehold to Dyer and Lippitt so that thereafter each owned a one-fourth interest in the properties.

On December 17, 1956, W. B. Hogg left the venture with the three remaining venturers assuming his outstanding liabilities in connection with the undertaking. During the same month the three adopted the name Portales Properties and filed an assumed name certificate with the County Clerk of El Paso, Texas. Earlier, in August 1956, a bank account had been opened with the El Paso National Bank in the name of Portales Properties. There were also other accounts in that name at the Preston State Bank at Dallas, Texas. Partnership returns were filed in the name of Portales for the calendar years 1956 and 1957.

During the course of the venture, United secured and advanced $588,722.04 for the construction and operation of the mill. This was done through disbursements to Oscura, with payments of the obligations of Oscura being made out of its bank accounts, or by payments from United directly to Oscura suppliers. The funds advanced by United were charged on its books as money due from Oscura. No funds were advanced to Oscura by the individuals. No expenses were paid by them. The evidence did show that the four individuals endorsed the corporate notes of United to enable the borrowing by United of the necessary capital. Lippitt put up property owned by him personally to secure the greater part of loans made, but all four either endorsed or guaranteed the indebtedness.

The sums advanced to Oscura which had been set up on the books of United as due from Oscura, were, in turn, set up on Oscura's books as due from Portales. This was done by general journal entry on September 30, 1956 and the books also reflected, through general journal entries on the same date, a transfer of operating assets and expenses from Oscura to Portales. There was no written assignment, bill of sale or other documentary basis for the general journal entries as of that date, and the entries were, or course, not simultaneous with the transactions reflected. They were simultaneous with the ending of Oscura's fiscal year. The books of Oscura had not theretofore indicated any direct financial relationship between it and the joint venture known as Portales. Its connection was with United.

Portales first showed the transfer of these operating assets and expenses on its books by general journal entry dated December 31, 1956, the date marking the end of its fiscal year. Thereafter periodic entries were made on the books of Portales and Oscura to reflect transfers of operating assets, and expenses incurred and paid by Oscura or by United on behalf of Oscura. Oscura employed and paid the necessary staff for its mine operations, and maintained all employee withholding and social security records and returns.

On July 31, 1957 Portales Properties, again by general journal entry, transferred back to Oscura all of the operating assets and expenses theretofore transferred from Oscura. This was done in an effort to present the strongest possible case to the Small Business Administration on a loan application. This transfer was confirmed in October 1957, when Oscura was authorized by its directors to acquire the leasehold, mining claims, and the mill and mine equipment of Portales upon the assumption of the debts owed by those making up Portales to United. Greer, Dyer and Lippitt individually, and Lippitt on behalf of Oscura, executed the transfer on these terms.

The ore produced in the mine was delivered to the American Smelting and Refining Company beginning in August of 1956. Payments for ore were made to Portales, or for its account.

It is the position of petitioners that they retained title, as individuals, in the years in question to the leasehold which.

included the minerals, and that expenses and income go with that ownership. They also contend that Oscura was merely their agent in operating the mining properties, and hence the sums paid by Oscura which constitute the business expense in question were in fact paid by them. They seek to avoid the position that the corporate entity of Oscura should be disregarded as such.

In essence, since the expenses were paid by Oscura, petitioners necessarily assumed the burden of demonstrating that they were paid by Oscura as their agent and for their account either in fact, or because of their ownership of the leasehold. They buttress their position by asserting that the mill was constructed on the leasehold property, by their receipt of payments for the ore, and by the entries on the books and records of Oscura and Portales. On the other hand, the funds for the construction and operation of the mill were advanced by United and not by petitioners and their group, except indirectly as they may have made funds available to United as stockholders. The accounting procedures as between Oscura and the individuals doing business as Portales were, to say the least, fluid, and in a background situation of employing two undercapitalized corporations with a joint venture. The accountant for Oscura and United, who was, incidentally, an employee during the time in question of petitioner Greer, testified that Oscura was to be the operating company with reference to the mine and mill, and that United was to furnish necessary funds and perform as the management company.

■ In this context we come at once to the principle that the Tax Court is the trier of the facts within the context of the clearly erroneous standard. Its function is to draw appropriate inferences from the proven facts and to determine what a given transaction amounts to in substance. Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218; Commissioner of Internal Revenue

v. Killian, 5 Cir., 1963, 314 F.2d 852; 26 U.S.C.A. § 7482(a); and Rule 52(a), F.R.Civ.P.

■ This principle must be coupled under the circumstances here with the proposition that the corporate entity of Oscura may not be disregarded for tax purposes. In Moline Properties v. Commissioner, 1943, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499, the Supreme Court said:

"The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * *"

■■ We turn then to the agency theory. It cannot be doubted that petitioners and their group could employ an operating agent if this were the case. But, the test to be met by way of proof is as the Supreme Court said in National Carbide Corp. v. Commissioner, 1949, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed 779:

"What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. Whether the corporation operates in the name and for the account of the principal, binds the principal, by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent up-

on the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent."

Here, as the statement of facts demonstrates, conflicting inferences could be drawn from the evidence with respect to the agency *vel non* of Oscura. There was no written proof of an agency agreement. The only writing indicating what the role of Oscura was to be appears in the minutes of the first meeting of its board of directors, October 15, 1955. It had the opportunity to operate and mine the leasehold properties for a percentage of the net profits.[3] There is no evidence as to what the division of net profits was to be. There were no contemporaneous financial transactions to indicate agency in the first few months of operation. The books were set up on such a basis only after several months of operation, and when tax returns were due from Oscura and the joint venturers. The Tax Court decided the question adversely to petitioners who bore the burden of establishing the agency. There it must end.

An argument, ancillary in nature to the agency argument and used to support it, is that petitioners and their group bore the ultimate economic risk of loss. This is likewise without merit. Such an element of risk rests on stockholders in any corporate venture, and a holding to the contrary would emasculate for all intents and purposes any requirement of respect for and recognition of corporate entities. See Moline Properties, supra and National Carbide Corporation, supra.

■ The other argument of petitioners finds its support in the facts that the individuals owned the leasehold, that the lease required the mill operation, and that the mill was erected on the leased property. It is said to follow from this that the expenses of establishment and operation, may not be separated from the ownership of the leasehold.

This is the reverse application of the "fruit and tree" axiom that taxes on income may not be avoided by assigning the right to receive it without the transfer of the property from which the right arises. 2 Mertens, Law of Federal Income Taxation, § 18.02. Cf. Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 to the effect that income derived from the production of oil and gas and the deduction for depletion allowance is attributable for income tax purposes, to the extent of his interest, to the person having the capital investment in the oil and gas in place. The "fruit and tree" analogy stems from language used in Lucas v. Earl, 1930, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. And the same rule has been applied with respect to the attribution of income with a consequent deduction for depletion and bad debts. Sowell v. Commissioner, 5 Cir., 1962, 302 F.2d 177.

The answer to this contention is that there is no record of any construction or operating arrangement between Oscura and the individuals trading as Portales Properties. We start with the proposition that the plant was constructed, and the property mined by Oscura. What the arrangement was beyond that is not clear. The record supports an inference that possession of the leasehold properties was surrendered to Oscura to the extent of allowing the construction of the plant and the subsequent mining by it. This state of affairs was the doing of the venturers, including petitioners, who were in control of the situation. The burden was on petitioners to show that the tree did not go with the fruit. Absent such a showing, as was the case, this contention falls. Cf. Campbell v. Commissioner, 5 Cir., 1947, 159 F.2d 629.

■ "Economic realities determine tax consequences." Weinert's Estate v.

---

3. In pertinent part:
"The President then stated to the Board that W. B. Hogg and A. L. Greer, as a joint venture, had acquired a lead mine in the County of Socorro, State of New Mexico, and that the Corporation had the opportunity to operate and mine said properties wherein it would derive a percentage of the net profits as a result of said operation * * *"

Commissioner, 5 Cir., 1961, 294 F.2d 750. The realities here were to be determined by the Tax Court. We find no error in the determination made.

Affirmed.