345 F.2d 933
 WILLOW TERRACE DEVELOPMENT CO., Inc. and Post Oak Manor Building Co., Inc., Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
WILLOW TERRACE DEVELOPMENT CO., Inc. and Post Oak Manor Building Co., Inc., Respondents.
 No. 21241.
 United States Court of Appeals Fifth Circuit.
 June 1, 1965.
 Rehearing Denied July 1, 1965.
 
 Robert H. McCanne, W. Carlos, Jr., and Morris, Termini, Harris, McCanne & Lacas, Houston, Tex., for petitioners.
 Robert I. White, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Melva M. Graney, Attys., Dept. of Justice, Sheldon S. Cohen, Chief Counsel, I.R.S., Max G. Amsbacher, Atty., I.R.S., Crane C. Hauser, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent.
 Before GEWIN and BELL, Circuit Judges, and McRAE, District Judge.
 GRIFFIN B. BELL, Circuit Judge.
 
 
 1
 Taxpayers are the Willow Terrace Development Co., Inc., and its wholly-owned subsidiary, Post Oak Manor Building Co., Inc. Both corporations engaged in developing real estate subdivisions in the Houston area, and filed consolidated corporate income tax returns for the tax years here involved, 1955-1958. They petition to review a decision of the Tax Court requiring the Building Company to include in gross income the full amount of "trade-in-allowances" given to purchasers of new homes in return for equities in their old homes. The Commissioner cross-petitions from the Tax Court's decision allowing the Building Company to add the cost of constructing water and sewage facilities to the cost basis of the houses it built and sold. The opinion of the Tax Court is reported at 40 T.C. 689. We affirm on both questions.
 
 I. The Taxpayers' Appeal
 
 2
 Building Company built and sold new houses in the Post Oak Manor Subdivision in Harris County, Texas. In making sales of new houses, the building company often accepted the purchaser's interest or equity in his old house as part of the sales price for the new house in Post Oak Manor. The credit received by the purchaser, or "trade-in allowance," was treated as part of the down payment on the new house. The trade-in houses all had outstanding mortgages on them, and Building Company acquired them subject to the prior encumbrances. During the tax years here involved, Building Company made trade-in allowances on the equities in 151 houses in the total amount of $348,609.73.[1]
 
 
 3
 Rather than taking title to the trade-in houses directly, Building Company had the new house purchasers deed them to Terwil Corporation, a corporation owned in the same proportions by the same three men who owned Development Company which in turn owned Building Company.[2] Terwil attempted to resell the houses as soon as possible to avoid making mortgage payments, and all 151 were sold under contracts for a deed, with a small down payment, usually $200, and with the balance of the purchase price to be paid after the existing mortgage was satisfied. Interest on the contract price was to be paid in the interim. The total face amount of the 151 contracts was approximately $392,600, but when sales expenses were deducted from the initial payments totaling $34,200, the net amount of cash received was only $9,345.13. The balance due on the contracts was $358,600. There was no established market in the Houston area for the contracts received by Terwil Corporation for the trade-in houses.
 
 
 4
 The Commissioner determined that the entire amount of the trade-in allowances ($348,609.73) should be included in Building Company's gross income as part of the amount realized from the sale of new houses under § 1001(a), (b) of the Internal Revenue Code of 1954. That section provides that the "amount realized from the sale * * * of property shall be the sum of any money received plus the fair market value of the property (other than money) received." In the Tax Court, Building Company contended that the fair market value of the trade-in houses was not equal to the trade-in allowances, but was zero, or in any event, not more than from $8,000 to $12,000. The Tax Court held that Building Company failed to sustain its burden of showing that the fair market value of the trade-in houses was less than $348,609.73. We agree.
 
 
 5
 The standard for determining fair market value under § 1001 is well established. It is the price at which property will change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the facts. French Dry Cleaning Co. v. Commissioner of Internal Revenue, 5 Cir., 1934, 72 F.2d 167. The Tax Court applied this standard. Stiles v. Commissioner of Internal Revenue, 5 Cir., 1934, 69 F.2d 951, relied on by taxpayers for their contention that the proper standard is the amount presently realizable in cash, is not to the contrary. Indeed, the court in the French Dry Cleaning Co. case so stated.
 
 
 6
 Given that the Tax Court applied the proper legal standard in determining fair market value, there was ample evidence to support its conclusion that the fair market value of the equities in the trade-in houses was at least equal to $348,609.73, the amount of the trade-in allowances. One factor considered by the Tax Court was what they were actually sold for in the open market, $392,600. The receipt of only slightly more than $9,000 net in cash after sales expenses does not alter the fact that the price at which Terwil sold the houses was substantially above the trade-in allowances. Moreover, and this is the long and short of the matter, the Commissioner introduced the testimony of two real estate appraisers which established a value for the trade-in houses in excess of the trade-in allowances. Taxpayers' appraisers testified that the value of the houses was only $12,000, and there was other evidence to support the taxpayers' contention. However, the testimony of the Commissioner's witnesses was adequate, if credited as it was by the Tax Court, to carry the day for the Commissioner, and the finding by the Tax Court was in no event clearly erroneous. See Greer v. Commissioner of Internal Revenue, 5 Cir., 1964, 334 F.2d 20.
 
 
 7
 Taxpayers argue alternatively that even if the trade-in houses were worth the trade-in allowances, Building Company sold the houses to Terwil Corporation at a corresponding loss. In this regard, the Tax Court was correct in holding that there was no sale by Building Company to Terwil. Form must give way to substance in the tax law. Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Hindes v. United States, 5 Cir., 1964, 326 F.2d 150.[3]
 
 
 8
 It follows that the decision of the Tax Court requiring Building Company to include the full amount of the trade-in allowances in gross income must be and it is affirmed.
 
 II. The Commissioner's Appeal
 
 9
 Building Company constructed all houses in Post Oak Manor Subdivision in accordance with Federal Housing Administration specifications and requirements in order to secure FHA or Veteran's Administration loan insurance guarantees on the mortgages to be utilized in the purchase of the new houses. As a condition to issuing loan commitments on the subdivision, the FHA required that a satisfactory water system and sewerage disposal system be made available to the new houses. Building Company first attempted to secure these facilities from the City of Houston. Post Oak Manor was at that time beyond the city limits, and Houston declined to construct the facilities. After determining that it would be more economical to construct and operate its own systems rather than obtain them from a neighboring subdivider, Building Company constructed a water plant, sewerage disposal plant, and the necessary connecting systems. The total cost of these facilities to Building Company was $157,187.49.
 
 
 10
 By an instrument dated July 30, 1954, Building Company transferred the water and sewerage facilities to Post Oak Manor Water Company, Inc., a separate corporation owned in identical proportions by the same three men who owned Development Company and Building Company. The only consideration furnished by the Water Company was its agreement to operate the systems. The transfer agreement set the rates which Water Company would charge, and provided that the rates could be increased only if they proved insufficient to cover operating costs, provide sufficient reserves for replacement, obsolescence and depreciation, and a reasonable rate of return on the basis of capital investment.
 
 
 11
 Pursuant to FHA requirements, Water Company executed a trust deed transferring title to the facilities to an approved trustee for the benefit of the property owners. Water Company retained the active control and management of the systems, but the trust deed provided that if the Water Company abandoned the plant, changed the rate structure materially, or failed to provide satisfactory service, the trustee could take over the operation of the system for the benefit of the property owners.
 
 
 12
 Water Company carried the facilities on its books at a zero basis, and no depreciation was ever claimed on them. The president of the company received no salary. Without allowance for depreciation, the operations of the company from 1955 through 1959 produced net income for the five year period of $12,934.02.[4] Assuming a five per cent replacement factor per year on cost, the operation resulted in a net loss of $17,702.80.[5]
 
 
 13
 By an ordinance enacted on December 31, 1956, the city of Houston annexed an area which included the Post Oak Manor Subdivision. Action by the city to annex this area had been begun by at least the preceding February. By ordinance of May 1, 1957, the city prohibited private water companies in the annexed area from increasing their rates until future rate hearings. Water Company sought permission to increase its rates but was refused. Negotiations for the sale of the facilities to the city were begun, and in September, 1959, the city of Houston purchased all of Water Company's water and sewerage facilities for $221,200. There were about 60 private water and sewerage systems in the area annexed in December, 1956, but by November 1962, the city had acquired only 40 of them. From 1950 to 1955, the city acquired 47 private systems that were located in an area annexed to the city in 1950.
 
 
 14
 Building Company sought to deduct the full $157,000 cost of the water and sewer systems as part of the cost basis of the lots it had developed. This was accomplished by allocating a pro rata portion of the $157,000 to the cost of each of the 432 lots in the subdivision. Under §§ 1012 and 1016 of the Internal Revenue Code, the proper basis for the lots is "cost" plus "adjustment * * * for expenditures * * * properly chargeable to capital account." The Commissioner disallowed the deductions in full, taking the position that the cost of the water and sewerage systems was not part of the cost of the lots, but was an independent investment in separate valuable property, the cost of which should be recovered through capitalization or subsequent sale. The Tax Court, relying on its prior decision in Estate of Collins v. Commissioner of Internal Revenue, 1958, 31 T.C. 238, sided with the taxpayers, and the Commissioner appeals.
 
 
 15
 The Commissioner's position is that the facilities may be allocated to the cost of the lots only if they are constructed in order to sell the lots and are permanently and irrevocably dedicated to the lot owners so that the cost of the facilities is recoverable in no other manner. Thus, streets, sidewalks, public parks and recreation areas in which the developer retains no interest are properly considered part of the cost of the lots sold. See Country Club Estates, Inc. v. Commissioner of Internal Revenue, 22 T.C. 1283 (1954). However, the Commissioner contends that the water and sewerage systems here involved were a separate investment in valuable and potentially income producing property by the developer, which property was retained by the developer rather than dedicated to the homeowners. The cost of such an independent investment, according to the Commissioner, should be recovered through depreciation of the facilities or subsequent sale. Here the taxpayer did in fact recover the cost by selling the facilities to the City of Houston.
 
 
 16
 Estate of Collins v. Commissioner, supra, involved a sewerage disposal system. There the Tax Court stated the rule as follows:
 
 
 17
 "* * * if a person engaged in the business of exploiting a real estate subdivision constructs a facility thereon for the basic purpose of inducing people to buy lots therein, the cost of such construction is properly a part of the cost basis of the lots, even though the subdivider retains tenuous rights without practical value to the facility constructed (such as a contingent reversion), but if the subdivider retains `full ownership and control' of the facility and does `not part with the property * * * for the benefit of the subdivision lots,' then the cost of such facility is not properly a part of the cost basis for the lots."
 
 
 18
 The opinions of the Tax Court in Collins and in this case are buttressed by the recent decision of the Fourth Circuit in Commissioner of Internal Revenue v. Offutt, 4 Cir., 1964, 336 F.2d 483. Taxpayer in that case was allowed to deduct the cost of water and sewerage systems on facts very similar to those presented here. We agree with the Tax Court and with the Fourth Circuit.
 
 
 19
 The problem presented by these cases is whether deduction or capitalization of such costs will more accurately reflect the economic realities of the situation from the standpoint of the subdivider. We cannot accept the rule advocated by the Commissioner, which in effect allows deduction only when the costs can be recovered in no other manner. Some relevant factors to be considered in determining the proper tax treatment of the costs of such facilities are whether they were essential to the sale of the lots or houses, whether the purpose or intent of the subdivider in constructing them was to sell lots or to make an independent investment in activity ancillary to the sale of lots or houses, whether and the extent to which the facilities are dedicated to the homeowners, what rights and of what value are retained by the subdivider, and the likelihood of recovery of the costs through subsequent sale. These factors were considered in Collins, and the holding centered on the basic purpose test as modified by ownership. The Tax Court said:
 
 
 20
 "* * * We have concluded that petitioners constructed the sewerage system not only for the basic purpose but for the sole purpose of inducing and making possible the sale of lots * * *, that they did not retain full ownership and control of the sewerage system, and that they parted with material property rights therein for the benefit of the subdivision lots."
 
 
 21
 In the present case the facts meet this test and support the conclusion of the Tax Court. The basic purpose of Building Company in constructing the facilities was to sell lots and houses, not to invest in the water and sewerage business. It was essential that the lots in the subdivision be supplied with water and sewerage, both in order to sell the lots and in order to secure FHA financing. Building Company constructed the facilities itself only after the City of Houston refused and after it was determined that to secure them from a neighboring subdivider would be more expensive.
 
 
 22
 The water and sewerage systems were, under the FHA trust deed, dedicated to the benefit of the lot owners. Legal title was held by the trustee for their benefit. Abandonment, impairment of service or any material increase in rates would give the trustee the right to take over the facilities. Water Company retained only the right and duty to operate the systems. There is no indication that the developers of Post Oak Manor anticipated any independent profit from the operations of Water Company, and, allowing for replacement costs, no profit was in fact made. At the time of the trust deed, the assets in the hands of Water Company had little if any saleable value. Sale to the City of Houston became possible only after the Post Oak Manor area was annexed to the city. The possibility of future sale to the city must be considered remote at that time, depending as it did on the vagaries of future annexation.
 
 
 23
 In sum, construction of the water and sewerage systems was necessary, if not essential, to the sale of homes in Post Oak Manor, and the systems were in fact constructed for that purpose, as distinguished from the purpose of independent investment. The facilities were dedicated to the benefit of the homeowners under the FHA trust deed, the rights retained by Water Company having at that time little if any saleable value, and the possibility of recovering the costs through future sale to the city was remote. The conclusion of the Tax Court that the cost of these facilities were properly allocated to the cost of the houses sold by Building Company rested on these conclusions of fact which find support in the record. Its decision was correct, and it is thus affirmed.
 
 
 24
 Affirmed on the petition and cross-petition.
 
 
 
 Notes:
 
 
 [1]
 The Tax Court stated:
 "A typical transaction would be somewhat as follows: Building Co. would offer a new house in Post Oak Manor for sale for $16,000. Mortgage arrangements on this new house could be made for $13,000. A prospective purchaser had a house that cost him $10,000 but was subject to an encumbrance of $8,000. He could buy Building Co.'s $16,000 home by paying $1,000 cash, deeding his old home to Terwil (subject to the $8,000 encumbrance) for which Building Co. would give him a $2,000 trade-in allowance, and making arrangements for a $13,000 mortgage on the new home to pay the balance of the $16,000 purchase price."
 
 
 [2]
 This method was followed to avoid showing any contingent liability of Building Company for the outstanding indebtedness against the trade-in houses on its financial statement, and to prevent it from becoming involved in foreclosures to the displeasure of the Federal Housing Administration
 
 
 [3]
 Building Company followed the book-keeping practice with respect to the trade-in allowances of debiting an account called trade-in allowances for the amounts allowed, and then writing off these amounts at the end of the year as worthless. On its tax returns for the years in question it reported the allowances as sales receipts but deducted the amount thereof as expense. In the Tax Court they contended simply that they had overstated their new house sales to the extent of the allowances since the equities in the trade-in houses were without value
 
 
 [4]
 The figures for each of the five years are as follows:
 Net Income: 1955 — $ (216.45) loss
 1959 — 1,044.47
 1957 — 12,697.20
 1956 — (2,877.60) loss
 1958 — 2,286.40
 
 
 [5]
 The corresponding annual figures are:
 Net Income: 1955 — $(2,146.43) loss
 1956 — (8,371.29) loss
 1957 — 5,202.79
 1958 — (5,572.97) loss
 1959 — (6,814.90) loss