DAVE STILLMAN AND SADYE STILLMAN, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5969–69—5971–69, 5984–69. Filed September 17, 1973.

*William Waller* and *Lawrence Dortch*, for the petitioners.
*Vallie C. Brooks*, for the respondent.

WILES, *Judge:*[*] Respondent determined the following deficiencies in petitioners' income tax and by its amended answer seeks the following increased deficiencies:[2]

| Docket No. | Year | Deficiency statutory notice | Increased deficiency per amended answer |
|---|---|---|---|
| 5969–69 | 1961 | $6,151.46 | None |
| | 1963 | 1,254.44 | $2,354.24 |
| | 1964 | 13,307.96 | 2,962.81 |
| | 1965 | 1,367.78 | 3,040.78 |
| 5970–69 | 1963 | 776.25 | 1,256.79 |
| | 1964 | 26,341.13 | 2,181.27 |
| 5971–69 | 1963 | 385.52 | 689.96 |
| | 1964 | 8,657.57 | 973.41 |
| | 1965 | 183.14 | 874.99 |
| 5984–69 | 1963 | 6,359.90 | 3,572.44 |

The issues for decision are:

(1) Whether Schatten-Cypress Co., a corporation, was the agent of Airport Realty Co., a partnership, with regard to the lease of certain property so that the petitioners are entitled to report income and deductions relating to the leased property.

---

[1] Proceedings of the following petitioners are consolidated herewith: Mandell L. Cypress and Frances Cypress, docket No. 5970–69; Alfred Shepard and Minette Shepard, docket No. 5971–69; and Emanuel Schatten and Joan Schatten, docket No. 5984–69.

[*] Pursuant to a notice of reassignment sent to counsel for the parties, and to which no objections were filed, this case was reassigned by the Chief Judge on Dec. 13, 1972, from Judge Austin Hoyt to Judge Darrell D. Wiles for disposition.

[2] The increased deficiencies result from respondent's allegation in the amended answer that no part of the deductions relating to the leasehold are available to petitioners because they were not the owners of the leasehold and improvements thereon.

(2) Whether a judgment and concomitant legal fees are deductible by the petitioners as an ordinary expense in 1964 or whether these expenses represent the cost of acquiring a new lease and should be capitalized over the life of such lease.

(3) Whether petitioners are entitled to depreciation or amortization of certain leasehold improvements on the basis of the original 25-year term of the lease or on the basis of a 45-year lease, the original term plus two 10-year renewal options.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Dave Stillman and Sadye Stillman are husband and wife who resided in Nashville, Tenn., on the date the petition was filed herein. For each of the calendar years 1961, 1963, 1964, and 1965, Dave and Sadye filed a joint Federal income tax return with either the district director of internal revenue at Nashville, Tenn., or with the director of the Southeast Service Center at Chamblee, Ga.

Petitioners Mandell L. Cypress and Frances Cypress are husband and wife who resided in Nashville, Tenn., on the date the petition was filed in their case. For each of the calendar years 1963, 1964, and 1965, Mandell and Frances filed a joint Federal income tax return with either the district director of internal revenue at Nashville, Tenn., or with the director of the Southeast Service Center at Chamblee, Ga.

Petitioners Alfred Shepard and Minette Shepard are husband and wife who resided in Nashville, Tenn., on the date the petition was filed in their case. For each of the calendar years 1963, 1964, and 1965, Alfred and Minette filed a joint Federal income tax return with either the district director of internal revenue at Nashville, Tenn., or with the director of the Southeast Service Center at Chamblee, Ga.

Petitioners Emanuel Schatten and Joan Schatten are husband and wife who resided at Nashville, Tenn., on the date the petition was filed in their case. For each of the calendar years 1963, 1964, and 1965, Emanuel and Joan filed a joint Federal income tax return with either the district director of internal revenue at Nashville, Tenn., or with the director of the Southeast Service Center at Chamblee, Ga.

For the calendar years 1963, 1964, and 1965, petitioners Sadye Stillman, Mandell Cypress, Alfred Shepard, and Emanuel Schatten reported taxable income or a loss from a partnership known as Airport Realty Co. (hereinafter referred to as Airport Realty) of Nashville, Tenn. The partnership interest was divided so that Sadye Stillman owned one-third, Emanuel Schatten and Mandell Cypress each owned four-fifteenths, and Alfred Shepard owned two-fifteenths. For each of the years 1961 through 1966, a partnership Federal income tax return was filed on behalf of Airport Realty with either the district

director of internal revenue at Nashville, Tenn., or with the director of the Southeast Service Center at Chamblee, Ga.

On June 1, 1960, Emanuel Schatten, signing as president of Schatten-Cypress Co., Inc. (hereinafter referred to as Schatten-Cypress), wrote a letter to representatives of the City of Nashville, offering to lease 6 acres of unimproved land in the Airport Development on Murfreesboro Road. On July 21, 1960, the City of Nashville and Schatten-Cypress entered into a written agreement which granted to Schatten-Cypress an option until February 21, 1961, to lease the unimproved land.

On August 19, 1960, Schatten-Cypress entered into an agreement with Lee Shops, Inc. of Boston, Mass., whereby Schatten-Cypress agreed to lease to Lee Shops the property to be leased by Schatten-Cypress from the City of Nashville. Schatten-Cypress agreed to construct on the premises a building of not less than 60,000 square feet of floor area and a parking lot. The 15-year term of the lease would commence upon completion of the building. Lee Shops agreed to pay an annual rental of 2 percent of the first $4 million of sales per year, 1½ percent of the net $2 million of sales and 1 percent of any sales over $6 million with a minimum guaranteed rental of $75,000 per year. Lee Shops intended to sublease the building to be erected on the property to a subsidiary for the purposes of operating a discount store. The agreement provided that the lease was "subject to a loan from the Community Investment Corporation" of Lawrence, Mass., in the amount of $200,000 to be used in the construction of the building. Schatten, who carried out the negotiations with Lee Shops, insisted on making the lease subject to permanent financing because he realized that Lee Shops was not a large company and because a discount store operation was new and speculative in the Nashville area.

With regard to financing the project, Schatten-Cypress intended to follow the typical procedure whereby the developer submits preliminary plans for the project to a permanent lender who, if it approves of the long-term loan needed to finance the project, gives the applicant a commitment letter setting forth the terms of the loan. Once a reputable financial institution makes such a commitment, under normal financial conditions the commitment letter is accepted by most commercial banks throughout the country as adequate security to extend a temporary loan to the investor to allow him to construct the improvement on the real property involved. Upon completion of the improvement, the permanent loan is consummated and the proceeds of such loan are used to pay off the temporary construction loan from the local bank.

Prior to December 22, 1960, Schatten-Cypress and Community Investment Corp. carried out negotiations with regard to the

proposed loan. Community Investment refused to make the loan to Schatten-Cypress unless the proposed lease between Schatten-Cypress and the City of Nashville was changed to provide that upon termination of the lease the lessee would be required to deliver the premises in as good condition as normal wear and usage would permit, "damage by fire and other casualties excepted."

On December 22, 1960, the stockholders of Schatten-Cypress adopted a corporate resolution authorizing the corporation to lease from the City of Nashville the property in issue and to sublease this property to a subsidiary of Lee Shops. On the same day, Schatten-Cypress and the City of Nashville entered into a lease agreement whereby Schatten-Cypress leased, at a rental of $12,000 a year, the property near the airport for a period of 25 years, with two options to renew for additional periods of 10 years. The lease obligated the lessee to erect a 60,000-square-foot building within 270 days from the date of the lease. The lease did not contain the language that Community Investment had required be added before it would make the loan. The lease contained a provision that the lessee could not permit an assignment of the lease by operation of law or otherwise.

On January 17, 1961, Schatten-Cypress informed both Lee Shops and Community Investment Corp. that if Community Investment was unwilling to make the commitment for the loan under the lease, then Schatten-Cypress would seek other arrangements.

On January 23, 1961, Schatten announced at a meeting of the board of directors of Schatten-Cypress that the corporation was unable to obtain permanent financing from Community Investment. He stated that because the lease with the City of Nashville required that a building be constructed within 270 days, he had negotiated with the Third National Bank of Nashville to borrow money for construction on a short-term basis until the building was completed and permanent financing was arranged. He had been informed by the bank that it would not lend money to the corporation on such a basis but that it would loan the money to the individual shareholders of the corporation on personal signatures provided an additional person acceptable to the bank also signed the debt instrument.

The board of directors of Schatten-Cypress, therefore, adopted a resolution which provided that, because Schatten-Cypress was unable to raise the money to finance the construction of the building, Schatten-Cypress would enter into an agreement with its three shareholders, Emanuel Schatten, Mandell L. Cypress, and Alfred Shepard, and with Sadye Stillman, whereby Schatten-Cypress would hold the lease on behalf of the four individuals if they would provide the necessary financing for the construction of the building on said property. Sadye Stillman is the wife of Dave Stillman, who previously had informed

Schatten that he would like to invest in a real estate deal. The resolution provided that Schatten-Cypress would continue to hold the lease on behalf of the four individuals because of the clause in the lease agreement with the City of Nashville which prohibited the assignment of the lease by the lessee. Despite this resolution authorizing Schatten-Cypress to enter into such an agreement, no written agreement containing these provisions was ever executed.

On February 2, 1961, Schatten-Cypress executed a lease with Zayre Corp. under which Schatten-Cypress agreed to erect a 65,000-square-foot building at the same square-foot rental as that provided in the proposed Lee Shops lease, but with an agreement to pay a 5-percent real estate commission to Helmsley-Spear, Inc., the broker who had brought the parties together. Schatten-Cypress agreed to procure its own financing for the construction of the building because it believed that it could obtain such financing based on the significant net worth of Zayre Corp. The term of the lease was 20 years. Zayre was given the option to extend the lease for successive periods expiring on December 31, 1985, on December 31, 1995, and on December 31, 2005. The rental was to be based on the following formula: 1 percent of all appliance sales and 2 percent of so much of the miscellaneous sales that the sum of this amount and the percentage of appliance sales equaled $81,250; 0 percent of the next $250,000 of miscellaneous sales; 1½ percent of the next $500,000 of miscellaneous sales; and 1 percent of the remaining miscellaneous sales. The lease provided for a minimum annual rental of $81,250.

On April 28, 1961, the Third National Bank of Nashville made a temporary loan in the amount of $250,000 to Airport Realty for the construction of the building to be leased to Zayre. It was understood that this loan would be repaid when permanent financing was secured. The loan was disbursed by five payments between April 28, 1961, and July 11, 1961. These payments, less discounts for interest, were deposited in Airport Realty's checking account in the Third National Bank.

On May 3, 1961, Lee Shops filed an action in the United States District Court for the Middle District of Tennessee against Schatten-Cypress. Lee Shops alleged that Schatten-Cypress had breached its agreement to enter into a lease. The court rendered judgment in favor of Lee Shops for $200,000. The District Court found that although Schatten-Cypress had agreed to negotiate with the City of Nashville for the change in the lease required by Community Investment, Schatten-Cypress executed a lease with the City that did not contain the required language. The District Court's finding stated that the City had no reason not to agree to the change in the language required by Community Investment if a timely request had been made, since the

change would not have been disadvantageous to the City, which had agreed to other changes requested by Schatten-Cypress. To enable Schatten-Cypress to appeal without executing an appeal bond, Sadye Stillman put up securities owned by herself and Dave Stillman to be held by the Third National Bank in Nashville as escrow agent. The other partners of Airport Realty executed an agreement to indemnify her to the extent of their interests.

On July 25, 1961, Schatten-Cypress submitted an application to New England Mutual Life Insurance Co. for a loan for the construction of the Zayre store. On August 8, 1961, New England Mutual advised its correspondent for the State of Tennessee that its finance committee had approved the leasehold loan to Schatten-Cypress in the amount of $375,000 for 15 years at 6-percent interest with monthly payments of $3,165 applicable first to interest and the balance to principal. The loan was to be secured by a mortgage on Schatten-Cypress' leasehold interest in the land leased from the City of Nashville and an assignment of the sublease between Schatten-Cypress and Zayre. In its dealings with Boyle Investment Co., which negotiated the loan from New England Mutual, Schatten-Cypress acted as if it were securing the loan in its own behalf and never suggested that it was acting in an agency capacity.

On October 6, 1961, Schatten-Cypress obtained the loan from New England Mutual. A promissory note of $375,000 was executed on behalf of Schatten-Cypress by Emanuel Schatten as president. The note was personally endorsed by Emanuel Schatten, Mandell and Frances Cypress, Dave and Sadye Stillman, and Alfred Shepard. These endorsements, however, were not required as a condition for securing the loan. The closing of the loan was handled by Guaranty Title Co. of Nashville, Tenn., which on October 6, 1961, disbursed the net proceeds of the loan by its check made payable to Schatten-Cypress and Airport Realty. This check was deposited in the account of Airport Realty on October 6, 1961. On the same day a check was drawn on the account of Airport Realty, which check was payable to the Third National Bank in Nashville for the amount of the temporary loan.

On July 10, 1963, Schatten-Cypress and Malone & Hyde, Inc., a wholesale grocery company of Memphis, executed a lease agreement whereby Schatten-Cypress agreed to construct and lease to Malone & Hyde a supermarket adjacent to the Zayre store for an original term of not less than 18 years at an annual fixed rent of not less than $25,300.

On October 2, 1963, Schatten-Cypress and the City of Nashville executed an amendment to the lease of December 22, 1960. The amendment provided that the annual rental under the lease would be reduced by the amount of taxes assessed against the real estate and improve-

ments thereon except that this reduction feature did not apply to leasehold improvements made on the premises after July 1, 1963.

On August 22, 1963, Schatten-Cypress applied to New England Mutual for a long-term loan of $140,000 for construction of the building to be leased to Malone & Hyde as a retail store and supermarket.

On January 27, 1964, the board of directors of Schatten-Cypress adopted a resolution authorizing this loan. A promissory note for $140,000 was executed on May 29, 1964, and the loan was closed on August 25, 1964. The loan was secured by the personal obligations of Schatten, Stillman, and Cypress. It was also secured by a deed of trust on the leasehold interest of the corporation under the lease with the City, including the Zayre store and the store to be leased to Malone & Hyde, and an assignment of the corporation's interest in the leases to Zayre and Malone & Hyde. The proceeds from this loan were deposited in the bank account of Airport Realty on August 27, 1964.

In order to construct the building to be used as a supermarket by Malone & Hyde, Airport Realty had obtained a temporary construction loan in the amount of $150,000 from the Third National Bank. This loan was disbursed in five payments made between December 4, 1963, and April 2, 1964. The construction loan was repaid by Airport Realty to the extent of $140,000 by a check drawn on August 31, 1964. The loan was satisfied by a final payment made in February 1965.

During the years in issue, the only income and expenses reported on the partnership returns filed by Airport Realty related to the leases on the Zayre building and the Malone & Hyde Supermarket. Airport Realty had no full-time employees during these years. It did not have an office or a telephone, and its mailing address was the same as that of Schatten-Cypress.

During the years in issue, rent due under the leases between Schatten-Cypress and Zayre and between Schatten-Cypress and Malone & Hyde was paid by checks payable to Schatten-Cypress. These checks were endorsed "Schatten-Cypress Company for deposit to account of Airport Realty Company" and were deposited to the account of Airport Realty in the Third National Bank.

### OPINION

The first issue for decision is whether Schatten-Cypress, a corporation, was the real party in interest rather than an agent of Airport Realty, a partnership, with regard to the lease of the property in issue. The burden of proof with respect to this issue is upon respondent since he first pleaded this matter in his amended answer. Rule 32, Tax Court Rules of Practice. Schatten-Cypress obtained title to a lease-

hold interest in the property and performed certain services relating to the development of the property. The petitioners contend that Schatten-Cypress signed certain documents and performed certain services in an agency capacity and that Airport Realty was the real owner of the leasehold. The petitioners, therefore, argue that, as partnership members, they are entitled to report the income and deductions that relate to the leasehold. The respondent contends that, having elected for reasons advantageous to themselves to have the transactions in issue performed by a controlled corporate entity, the partners may not now avoid taxation at the corporate level by arguing that Schatten-Cypress was serving merely as an agent.

Whether a corporation serves as an agent for those interests that control it has been considered by the Supreme Court in *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436 (1943), and in *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949). In both of these cases the Supreme Court held that for tax purposes the corporations in issue were not agents of the interests that controlled them. Although the Supreme Court specifically stated that under certain circumstances a controlled corporation could be an agent for its shareholders, we conclude that the facts in the present case do not contain any more of the usual incidents of an agency relationship than were found in *Moline Properties* or *National Carbide*. Accordingly, we hold that Schatten-Cypress was not the agent of Airport Realty.

In *Moline Properties* the taxpayer was a corporation organized by Uly O. Thompson for the purpose of serving as a security device in connection with certain real estate owned by him. In return for the taxpayer's stock, Thompson conveyed the real estate to the taxpayer, which assumed the outstanding mortgages of the property. Thompson transferred the stock to a trustee to be held as security for a loan that Thompson used to pay back taxes on the property. The loan was made by the mortgagee of the real estate, who had suggested this arrangement.

Several years later the loan that occasioned the creation of the taxpayer was repaid and control of the taxpayer reverted to Thompson. The holdings of the taxpayer were sold in three parcels, the proceeds being received by Thompson and deposited in his bank account.

From the time of its incorporation until the time of the sale of its holdings, the taxpayer engaged in various business activities. These included the assumption of a certain obligation of Thompson to the original creditor, the defense of certain condemnation proceedings, the institution of a suit to remove restrictions imposed on the property by a prior deed, and the lease of a portion of the property as a parking lot. The taxpayer kept no books and maintained no bank

accounts during its existence and owned no assets other than the real estate described.

The taxpayer argued that the income received from the sale of the real estate was Thompson's income and not the taxpayer's and that it should not be treated as a separate taxable entity. The Supreme Court, however, held that when Thompson adopted the corporate form for his own advantage, he was also required to accept the tax disadvantages of this form.

The taxpayer also argued that it was the mere agent for its sole shareholder and that, as an agent, it should not be taxed on the income from the sales. Rejecting this argument, the Supreme Court said:

There was no actual contract of agency, nor the usual incidents of an agency relationship. Surely the mere fact of the existence of a corporation with one or several stockholders, regardless of the corporation's business activities, does not make the corporation the agent of its stockholders. Therefore, the question of agency or not depends upon the same legal issues as does the question of identity previously discussed.

The Supreme Court further considered the agency argument in *National Carbide Corp.* v. *Commissioner, supra,* in which the taxpayers were three wholly owned subsidiaries of Air Reduction Corp. (Airco). The operations of the subsidiaries were carried on strictly in accordance with contracts with Airco. The contracts provided that the subsidiaries were employed as agents to manage and operate plants and to sell the output of the plants. Airco was to furnish working capital, executive management, and office facilities for its subsidiaries. They in turn agreed to pay Airco all profits in excess of 6 percent on their outstanding capital stock, which in each case was nominal in amount.

Airco reported the profits turned over to it by the subsidiaries pursuant to the contracts as its own income. The taxpayers reported as income only the 6-percent return on capital that each was entitled to retain. The Commissioner took the position that the subsidiaries were taxable on the income turned over to Airco as well as the nominal amounts retained.

Citing *Moline Properties, Inc.* v. *Commissioner,* 319 U.S. 436 (1943), the subsidiaries argued that a corporate entity engaging in business activity cannot be taxed on amounts that it receives as an agent. The Commissioner contended that the arrangement between Airco and the subsidiaries did not contain the "usual incidents of an agency relationship," as that phrase was used in *Moline Properties.* The Supreme Court stated that the contention that the subsidiaries were the agents of their owner was simply a different form of the argument that the subsidiaries had no corporate identity distinct from their stockholders. The Supreme Court found that there was no difference in

principle between Airco's control of the subsidiaries and that exercised over Moline Properties, Inc., by its sole shareholder. It also found that the earnings of the subsidiaries were turned over to Airco not because the latter could command this income if the subsidiaries were owned by third persons, but because Airco owned and thus completely dominated the subsidiaries. Accordingly, the Supreme Court held that the arrangement between Airco and its subsidiaries did not contain the "usual incidents of an agency relationship" and that the subsidiaries were taxable on the income turned over to Airco.

In *Moline Properties*, the corporation was created specifically for the purpose of holding title to certain land. The corporation in *Moline Properties* therefore argued that it should not be treated as a viable corporate entity. This argument has not been advanced in the present case because Schatten-Cypress had an established history as a corporate entity operating in the real estate and insurance businesses.

The evidence in the present case establishes that when Schatten-Cypress first took title to the leasehold, it intended to develop the property itself, and it was not until this course of action proved difficult that Schatten-Cypress even considered holding the property on behalf of the petitioners.

On December 22, 1960, the stockholders of Schatten-Cypress adopted a corporate resolution authorizing the corporation to lease from the City of Nashville the property in issue and to sublease this property to a subsidiary of Lee Shops. The resolution contains not the slightest implication that the corporation is acting in an agency capacity. About a year later on January 23, 1961, a resolution was adopted which stated that because the corporation was unable to obtain a temporary loan for construction of improvements on the leased property, the corporation would enter into an agreement whereby it would hold the lease on behalf of its three stockholders and Sadye Stillman, the four of whom were able to provide the necessary financing. The record does not reveal, however, that a written agreement containing these provisions was ever executed. Despite the passage of this resolution, we find that the corporate acts of Schatten-Cypress after this resolution did not differ materially from those before the resolution when Schatten-Cypress clearly was acting in a nonagency capacity.

Before the resolution of January 23, 1961, Schatten-Cypress leased the property in issue from the City of Nashville and entered into an agreement with Lee Shops whereby Schatten-Cypress would sublease the property to a Lee Shops' subsidiary. Schatten-Cypress also attempted to secure a loan from Community Investment Corp. After the resolution of January 23, Schatten-Cypress entered into an agreement with Zayre for the subleasing of the property and successfully

obtained financing from New England Mutual Life. The application was submitted with the offer of the personal endorsements of the petitioners. These endorsements, however, were not required as a condition for securing the loan. Because of the similarities between the actions of Schatten-Cypress before and after the January resolution, we find that the mere passage of a resolution stating that Schatten-Cypress henceforward held the lease on behalf of the petitioners is not sufficient to establish that the role of Schatten-Cypress had really changed.

It is significant that Schatten-Cypress and Airport Realty apparently never entered into an agency agreement containing definite terms and that Schatten-Cypress was not compensated for the services that it performed. The record does not establish that Schatten-Cypress was in the business of serving as an agent or that it previously had held title to property solely on behalf of unrelated third parties. Although the presence of these factors is not required in order to find the existence of an agency arrangement, we believe that the absence of each of these factors in the instant case weighs heavily against petitioners' contentions that a corporation wholly controlled by three of them was acting as a true agent.

Petitioners argue that the only acts performed by Schatten-Cypress were those that it was required to perform because it held title to the lease from the City of Nashville. Petitioners point out that the temporary loans used to construct the buildings on the leased land were obtained by Airport Realty and that these loans were repaid by checks drawn on the bank account of Airport Realty. Petitioners also note that the rental checks were turned over to Airport Realty by Schatten-Cypress and were deposited in the bank account of Airport Realty.

We do not believe that these acts on the part of Airport Realty are sufficient to establish that Airport Realty was the principal and Schatten-Cypress was merely an agent. The record establishes that Schatten-Cypress performed all the acts that were significant and essential to the success of the transactions in issue. Schatten-Cypress held title to the leasehold, subleased the property in issue, obtained permanent financing for construction of stores on the property, for which loans it used its leasehold as security, and received the rents from the sublessees. Schatten-Cypress also defended the lawsuit relating to the leased property.

In marked contrast, most of the acts performed by Airport Realty reflected only bookkeeping adjustments. Although we do not find that Airport Realty was a sham organization, we believe it is significant that the alleged principal in these transactions had no full-time employees during the years in issue, had no office or telephone, and used the mailing address of Schatten-Cypress. The temporary construction

loan was obtained in the name of Airport Realty; however, as contemplated by the parties, this loan was repaid when permanent financing was obtained by Schatten-Cypress. After Schatten-Cypress obtained the permanent financing, the loan proceeds were deposited in Airport Realty's bank account. Thus, Airport Realty actually repaid the temporary loan with funds that Schatten-Cypress borrowed and for which Schatten-Cypress had pledged security. The rents received from the sublessees were deposited in Airport Realty's bank account, but only because Schatten-Cypress had turned the rents over to Airport Realty. We conclude that Schatten-Cypress turned over the proceeds from the permanent loans and the rental income from the sublessees to Airport Realty, not because the latter could command this income if Schatten-Cypress were owned by persons other than Schatten, Cypress, and Shepard, but because it was owned by such individuals who completely dominated it. It was this very factor that the Supreme Court relied on in *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949), to find that the dominated corporations were not agents. See *Harrison Property Management Co.* v. *United States*, 475 F. 2d 623 (Ct. Cl. 1973); *Greer* v. *Commissioner*, 334 F. 2d 20 (C.A. 5, 1964), affirming a Memorandum Opinion of this Court; *Tomlinson* v. *Miles*, 316 F. 2d 710 (C.A. 5, 1963), certiorari denied 375 U.S. 828 (1963), rehearing denied 375 U.S. 926 (1963); *David F. Bolger*, 59 T.C. 760 (1973), on appeal (C.A. 3, Aug. 13, 1973).

In *Moline Properties* and *National Carbide* the controlled corporations were wholly owned by either one individual or by one corporation. In the present case, however, Sadye Stillman, who had a one-third interest in Airport Realty, was not a stockholder of Schatten-Cypress. Petitioners contend that, with respect to the leases, Schatten-Cypress could not have been acting in any capacity other than as an agent or passive trustee in its relations with Sadye Stillman. Petitioners reason that if Schatten-Cypress was acting as an agent on behalf of Sayde Stillman, then it necessarily was acting as an agent on behalf of the other partners of Airport Realty.

In support of this position, petitioners cite *Carver* v. *United States*, 412 F. 2d 233 (Ct. Cl. 1969), in which the Court of Claims held that a corporation held title to certain land as an agent for a partnership in which the corporation's sole shareholder and another individual each owned a one-half interest. We believe that the facts in the present case are distinguishable from those in *Carver*. In that case the court stated the facts as follows:

In 1935, Mr. Carver [the sole shareholder of Chase National] joined with L. N. Pipkin, at *Mr. Pipkin's request*, in the purchase of some 800 acres of raw land in Hillsborough County, then up for foreclosure. Mr. Pipkin was president of the

Bank of Mulberry. *At his request,* title to the land was taken in the name of Chase National, and arrangements were made whereby Chase National obtained a loan from and opened an account in the Bank of Mulberry. Mr. Pipkin, *as the moving force in the transaction,* saw to the payment of the loan with funds contributed by himself and Mr. Carver. Twenty years later, in 1955, *Mr. Pipkin negotiated a sale of the land for a substantial profit.* The sale proceeds were paid to Messrs. Pipkin and Carver, and did not go through Chase National, although the deed of conveyance came, of course, from Chase National, since it held the legal title. [Emphasis supplied.]

We believe that the court in *Carver* considered as a crucial factor the extent to which Pipkin was the moving force in the transaction. In the present case, however, Sadye Stillman held only a one-third interest in Airport Realty and was at most a passive investor and guarantor. Sayde Stillman did not initiate the transactions and apparently did not take part in any business decisions or negotiations. We do not believe that the inclusion in the partnership of such a passive interest warrants the conclusion that Schatten-Cypress was an agent for tax purposes. This factor does not negate the conclusion that Schatten-Cypress performed duties for Airport Realty because it was dominated by individuals who had an interest in Airport Realty. For tax purposes, an agency relationship does not exist between related entities unless the agent performs duties for the principal because the latter could command such a performance even if the entities were not related. *National Carbide Corp.* v. *Commissioner, supra.* The record in the present case does not establish such a relationship. If we were to hold that the inclusion of a minor and passive interest in such a partnership serves to transform a controlled corporation into an agent, we would permit the decisions in *Moline Properties* and *National Carbide* to be circumvented by the inclusion in a partnership of any individual not owning an interest in the controlled corporation.

Having found that Schatten-Cypress was not the agent of Airport Realty, we hold that Schatten-Cypress was the proper party to report the income and deductions associated with the transactions in issue. The judgment against Schatten-Cypress and concomitant legal fees were expenses incurred by Schatten-Cypress that are not deductible by the petitioners. Schatten-Cypress is also the proper party to depreciate the leasehold improvements since it had the investment in those improvements. It is, therefore, unnecessary for us to consider the arguments that petitioners have presented regarding the extent to which they should have reported income and deductions in connection with these transactions.

*Decisions will be entered under Rule 50.*