**Goodwyn CATES and Wynelle J. Cates, and Charles O. Cates, Jr., and the Estate of Billie B. Cates, Deceased, Charles O. Cates, Jr., Administrator, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 82–8363.

United States Court of Appeals, Eleventh Circuit.

Oct. 11, 1983.

---

James R. Harper, Atlanta, Ga., for petitioners-appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, William S. Estabrook, William P. Wang, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before JOHNSON and HENDERSON, Circuit Judges, and ALLGOOD *, District Judge.

ALLGOOD, District Judge:

This appeal is from a decision of the United States Tax Court[1] holding that the appellants/taxpayers (taxpayers) had realized short term capital gains from the sale of their stock options in Metro "400," Inc. (Metro) and that taxpayers were liable for a 5 percent addition to tax pursuant to Section 6653(a) of the Internal Revenue Code of 1954 [26 U.S.C. 6653(a)].

In early 1972 Calvin Thomas (Calvin) learned that 258.477 acres of land in Alpharetta, Georgia (located just outside of Atlanta) were for sale. He discussed the purchase of this land with the appellants, Charles Cates (Charles) and Goodwyn Cates (Goodwyn). On May 23, 1972 Calvin, alone, signed a contract to purchase the land. On the advice of his attorney (McClelland), Calvin formed a corporation, Metro "400", and transferred his option to purchase the land to Metro.

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. *Calvin A. Thomas, Transferee of Metro "400," Inc., et al. v. Commissioner,* 42 T.C.M. (CCH) 496 (1981).

On September 20, 1972, Calvin and McClelland, respectively, subscribed for 900 and 300 shares of Metro stock, Calvin paying for his and McClelland receiving his as payment for his legal services. On September 21, 1972, the contract for the sale of the land was closed in Metro's name.

Prior to the acquisition of the land by Metro, Calvin, Charles and Goodwyn discussed methods for dealing with the anticipated profits from the sale of the land and decided that each would receive a ⅓ interest, by way of stock options for Charles and Goodwyn. Sometime thereafter McClelland drafted documents granting Charles an option for ½ of the shares. This option was signed and notarized but not dated. Later Calvin, as president of Metro, changed the amounts on the option from 50% to ⅔ and initialed the change. Charles then executed an option granting Goodwyn ½ of his shares. This option was also undated. Calvin thereafter executed options dated September 20, 1972 granting Charles and Goodwyn ⅓ interests in Metro. During the latter part of December, 1972, McClelland surrendered his 300 shares of Metro stock for a flat fee for his legal services.

On December 28, 1972 Calvin executed a personal financial statement which indicated that he had a 50% interest in the property. On January 21, 1973 he executed another financial statement which indicated he had a ⅓ interest in the property. On January 22, 1973 Charles executed a financial statement indicating he held a ⅔ interest in the property.

Metro contracted to sell the property on March 14, 1973. On June 26, 1973 Metro sold the land. Charles and Goodwyn each received $283,321.63 as the purchase price of their stock options. On June 30, 1973 Thomas received $273,082.00 for his 900 shares of Metro stock and on July 17, 1973 Metro filed a corporate dissolution form with I.R.S.

All three parties reported long term capital gains from the sale of the stock or stock options. The Commissioner determined that both Charles and Goodwyn received ordinary income from the sale. In addition, other business deductions were claimed which were disallowed.

The Tax Court agreed with the Commissioner that Charles and Goodwyn received ordinary income from the sale of their stock options. The Tax Court also disallowed the various other business expenses. Charles and Goodwyn were found liable for additional taxes pursuant to I.R.C. § 6653(a).

The taxpayers appeal the decision of the Tax Court, arguing that they held their stock options for more than six months, which is the required holding period for a capital asset to qualify for long term capital gain treatment. They further argue that the Tax Court erred in finding that their failure to report income was due to negligence or intentional disregard of rules and regulations thus making them liable for an additional 5% penalty.

Section 1222(3) of the Internal Revenue Code of 1954 (26 U.S.C.), as applicable for the taxable years in question, provides:

(3) *Long-term capital gain.*—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

The holding period of a capital asset is determined by excluding the date of acquisition and including the date of disposal. *Fogel v. Commissioner,* 203 F.2d 347, 349 (5th Cir.1953). In this case appellants (Charles and Goodwyn) each sold his option on June 26, 1973. In order for the sale of these two options to qualify for long-term capital gains treatment, appellants must have acquired the options prior to December 26, 1972. The Commissioner determined that appellants had not met the holding period requirements and accordingly determined that they had realized short-term capital gains from the sale of their options. The burden was then on the appellants to show that they held the options for more than six months. See e.g. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Ellis Banking Corp. v.*

*Commissioner,* 688 F.2d 1376, 1382–1383 (11th Cir.1982); Rule 142(a), Rules of Practice and Procedure of the United States Tax Court (May 1, 1979). The Tax Court held "[t]he evidence adduced by Charles and Goodwyn as to the date of issuance of the options is, at best, equivocal. None of the witnesses could recall the dates the various draft options were executed, and they could only conjecture that the options were granted in August or September of 1972, sometime before closing on the land by Metro." The Tax Court's holding regarding this matter is a finding of fact and may be set aside on review only if the finding is clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure; *Jones v. Commissioner of Internal Revenue,* 640 F.2d 745, 752 (5th Cir.1981), cert. denied 454 U.S. 965 (1981); *Greer v. Commissioner of Internal Revenue,* 334 F.2d 20 (5th Cir.1964), 38 T.C. 1044.

■ This court does not find the Tax Court's holding to be clearly erroneous, indeed there is ample evidence to support its finding. The tax court specifically discussed three reasons for its finding that the 6-month holding period requirement had not been met by appellants: (1) McClelland held 300 shares of Metro stock until December 1972, which clearly precluded appellants from holding a ⅓ interest prior to his surrender of the stock; (2) the personal financial statements of Calvin show that he held a 50% interest in the land in question on December 28, 1972 and a ⅓ interest on January 21, 1972 which indicates that the change in the draft option occurred sometime after December 28, 1972[2]; and (3) a demand note executed by Goodwyn dated September 20, 1972, and alleged to indicate

Goodwyn's ⅓ interest was for an amount which would not have been ascertainable on that date.[3]

Appellants also argue that, for purposes of determining their holding period, they had an equitable interest in the property such that an implied trust arose on September 21, 1972. The Commissioner asserts that this argument was not timely raised and should not be dealt with by this court since no miscarriage of justice would result from a failure to consider it for the first time on appeal. *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 100 (11th Cir.1982). Even if, arguendo, this court should find that this issue was timely raised, the appellants could not prevail since the record does not reveal that whatever rights the appellants might have had vested in them "the benefits and burdens of ownership" which in other cases have been found sufficient to commence the running of the required holding period. *Boykin v. Commissioner,* 344 F.2d 889 (5th Cir.1965), 41 T.C. 925.

■ Finally, appellants argue that the Tax Court erred in holding them liable for an addition to tax pursuant to Code Section 6653(a). The burden was on the appellants to demonstrate that the Commissioner had erred in imposing this addition to tax. *Potito v. Commissioner,* 534 F.2d 49, 53 (5th Cir.1976), cert. denied 439 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 751 (1978). The Tax Court found that appellants had not produced evidence to show that the deductions and omissions were not the result of negligence or intentional disregard of the rules and regulations and therefore held for the Commissioner. This court finds that the record fully supports the Tax Court's imposition of the penalty.

**2.** Appellants argue on appeal that the personal financial statements utilized by the Tax Court contain "numerous inaccuracies," that "demonstrate the complete unreliability of the . . . statements." The inconsistencies complained of do not generally relate to the transaction in question. What is important in the instant case is the change in the quantity of land in which Calvin claimed an interest on the two financial statements (dated Dec. 28, 1972 and Jan. 21, 1973), and the consistency between the financial statement prepared by Calvin on January 21, 1973, the statement prepared by

Charles on January 22, 1973 (which indicated that he held a ⅔ interest in the property), and the two undated options.

**3.** The note for $13,649.64 bears the notation "⅓ Cost Expenses, Total $40,948.94;" it represents ⅓ of all loans repaid to Calvin and Charles by Metro. It is unclear how the exact figure could have been reached on September 20, 1972 as the repayment was not made until after June 26, 1973.

The judgment of the Tax Court is AFFIRMED.