Peter J. VAUGHN

v.

The UNITED STATES.

No. 526–81T.

United States Claims Court.

Aug. 24, 1983.

Robert J. Murray, Omaha, Neb., for plaintiff. David D. Begley and Murray & Sonderegger, Omaha, Neb., of counsel.

David C. Hickman, with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D.C., of counsel.

## OPINION

PHILIP R. MILLER, Judge:

This is a suit for refund of income taxes paid for the years 1976 and 1977. The question presented is whether the losses from the operation of an apartment complex were losses of the corporation which held title to the property and executed the mortgage note, as the government contends, or were deductible from the income of the members of a partnership on the ground that the corporation was merely acting as agent for the partners, as the taxpayer contends.

### Facts

On December 1, 1973, L. Vernon Cagle, a builder, and plaintiff, Peter J. Vaughn, his attorney, formed a limited partnership, Peppertree Apartments III, Ltd. (the partnership), to construct and operate a 131 unit apartment complex, the Cottonwood Apartments, in Council Bluffs, Iowa. Cagle was the general partner and Vaughn the original limited partner, but it was contemplated that other limited partners were to be admitted later. Cagle's capital contribution was not stated and Vaughn's was set at a nominal one dollar. However, profits, losses and the proceeds of any disposition were to be divided 90 percent to Cagle and 10 percent to Vaughn, with Vaughn's losses to be limited to his contribution.[1]

---

**1.** In July 1975 Cagle sold a 30 percent interest to C. Everett Alger, Sr., and another 10 percent interest to Arthur Pinkerton Trust. In Decem-

ber 1975 he sold a 9.5 percent interest to A.G. West. Thus during the taxable years 1976 and 1977 Cagle retained a 50.5 percent interest.

On the same day plaintiff and one Daniel Busick incorporated Peppertree Apartments III Co. (the corporation) under Iowa law with the two incorporators named as directors, Cagle as president and plaintiff as secretary-treasurer. The corporation was authorized to issue 5,000 shares of stock, but none were actually issued. The articles of incorporation stated that the corporation was organized to buy, sell, own and manage real property and to engage in related activities, with all the powers and rights granted to a corporation organized under the applicable Iowa law.

Also on the same date the partnership and the corporation entered into a "Nominee Agreement." The agreement recited that the corporation had obtained a mortgage loan commitment; that the partnership desired that the corporation act as its nominee to hold legal title to the real estate to facilitate financing of the construction thereon pursuant to the loan commitment; and that the corporation was willing to act as such nominee. Accordingly, such agreement provided that the corporation would hold title to the property as nominee of the partnership and subject to its direction while the partnership remained the beneficial owner thereof. Further, the corporation agreed that it would only engage in such activity with respect to the property as directed by the partnership, would turn over to the partnership any cash or other property received with respect to the real estate or apartment project and would upon demand by the partnership turn the deed to the property over to the partnership. There was no provision in this or any other agreement for payment to the corporation for acting as nominee or agent for the partnership, and none was in fact paid.

On January 18, 1974, the partnership purchased the land for the construction of the apartment project for $81,875, $63,180 of which it obtained as a loan from the United States National Bank of Omaha. It caused the seller to convey his deed for the land to the corporation and the deed was recorded in the corporation's name.

On February 22, 1974, the corporation borrowed $1,500,000 from the Banco Mortgage Company for the construction, giving its mortgage as security. Nothing in the note or mortgage or in a mortgage modification agreement executed August 13, 1974, indicated that the corporation executed those instruments as agent for the partnership.

On February 21, 1975, the corporation obtained permanent financing for the apartment project from the United States National Bank of Omaha. The corporation executed a note, a mortgage to secure the note, a financing statement, and an assignment of rents to the bank. The corporation also obtained title insurance, as well as other insurance on the property. The bank's records contain no information indicating that the corporation was acting merely as agent for the partnership, and the manager of the bank's real estate department, who made the loan, was not then aware that the corporation was so acting.

The corporation served the following purposes of the partners:

1. To acquire and hold title to the real property.

2. To execute the mortgage note so that no partner would be liable on it.

3. To enable borrowing of funds to acquire and build the project at a rate of interest in excess of that permitted by Iowa usury law for loans to natural persons.

4. To insulate the general partner from any other personal liability incident to ownership of the apartment complex.

5. To enable continuity of title and ownership of the property during the note and mortgage term and beyond, irrespective of what happened to the general partner.

No separate bank accounts or books of account were kept in the corporate name. The payments on the mortgage note were made with checks drawn upon the partnership bank account.

Business activities by or on behalf of the corporation are reflected in the following documentary evidence in the record:

On February 28, 1974, plaintiff, as attorney for the corporation, protested an adverse zoning ordinance of the City of Council Bluffs and requested an exception for a nonconforming use so that the corporation could obtain a building permit. On December 4, 1974, a contractor, Frontier Electric, Inc., which had apparently dealt with the corporation as the owner of the property, filed a mechanic's lien against the corporation, and on July 20, 1975, Frontier filed a petition in equity requesting judgment against the corporation and confirmation of a mechanic's lien against its property. The corporation defended the suit by filing an answer, a counterclaim for breach of contract and a request for admissions. On August 18, 1975, Korsmeyer Electric Supply Company, also filed a suit against the corporation for payment for electrical fixtures and supplies used in construction of the complex and for enforcement of its mechanic's lien on the property, and the corporation then filed a motion to produce the underlying documents. On August 19, 1975, a third supplier, West Dodge Electric Supply, Ltd., filed a suit seeking similar relief against the corporation as owner of the property and the corporation filed an answer. In none of the documents filed by the corporation did it disclaim liability on the ground that it was not the beneficial owner of the property but merely the partnership's agent. Finally, insurance binders for 1977–79 disclose that the corporation obtained fire, bodily injury and property damage liability and medical payments insurance on the apartment complex in its own name.

The operations of the Cottonwood Apartments resulted in net losses for tax purposes of $136,321 in 1976 and $91,099 in 1977. The losses were attributable mostly to depreciation allowances and mortgage interest.[2] The partnership reported these losses in an information return as partnership losses, and plaintiff reported his share thereof as deductions from income on his own tax returns. However, the Internal Revenue Service disallowed plaintiff's deductions on the ground that they were corporate and not partnership losses, resulting in tax deficiencies of $4,671 and $9,384 for 1976 and 1977, respectively.

After payment of such taxes, plaintiff filed timely claims for refund, and upon their disallowance timely filed this suit.

*Discussion*

For plaintiff to prevail in this case he must demonstrate that the losses he seeks to deduct as his own were attributable to property he owned in partnership rather than to property owned by the corporation. However, as discussed hereinafter plaintiff cannot establish this and therefore he is not entitled to prevail.

■ A cornerstone of the federal corporate tax structure is the principle that a corporation is a taxable entity distinct from its shareholders. Any argument for different treatment in a particular case requires consideration of two well known Supreme Court decisions: *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943) and *National Carbide Corp. v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949).

*Moline Properties, Inc.,* had been organized in 1928 by Thompson, its sole stockholder, as a security device in connection with certain Florida realty owned by him, at the suggestion of the mortgagee. The original mortgage loan assumed by the corporation was paid off in 1933. Thereafter the corporation was not dissolved but its property was again mortgaged, and in 1934 part of it was rented for a parking lot for $1,000. In 1934, 1935 and 1936 portions were sold. The corporation kept no books and maintained no bank account during its existence and owned no other assets.

The Board of Tax Appeals upheld the corporation's failure to report the gain on the 1935 and 1936 sales on the ground that

2. Deductions for these items were:

|  | 1976 | 1977 |
| --- | --- | --- |
| Depreciation allowances | $180,556 | $160,375 |
| Mortgage interest | 159,500 | 145,742 |
| Total | $340,056 | $306,117 |

"because of its limited purpose the corporation 'was a mere figmentary agent which should be disregarded in the assessment of taxes'." (*Moline Properties,* 319 U.S. at 438, 63 S.Ct. at 1133.) However, the Supreme Court reversed the Board "in the face of its finding that 'Full beneficial ownership was in Thompson [the sole stockholder], who continued to manage and regard the property as his own individually'" (*National Carbide Corp.,* 336 U.S. at 433–34, 69 S.Ct. at 732) on the ground that "The facts, it seems to us, compel the conclusion that the taxpayer had a tax identity distinct from its stockholder." (*Moline Properties,* 319 U.S. at 440, 63 S.Ct. at 1134.) In its opinion the Court stated (*Ibid.* at 438–39, 63 S.Ct. at 1133–34):

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * In *Burnet v. Commonwealth Improvement Co.* [287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399 (1932)] * * this Court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for purposes of his own. The choice of the advantages of incorporation to do business, it was held, required the acceptance of the tax disadvantages. [Footnotes and citations omitted.]

In *Moline Properties* the corporation also urged that it was a mere agent for its stockholder and that the same tax consequences followed as in the case of any corporate agent or fiduciary. The Court responded that this was "basically the same argument of identity in a different form" and, that because there was no actual contract of agency nor usual incidents of an agency relationship, the mere fact that a corporation had only one or several stockholders did not make the corporation the agent of its stockholders. *Id.* at 440, 63 S.Ct. at 1134.

*National Carbide Corp.* examined the question of whether or not an express agreement that a corporation was to act as agent for its shareholder could be effective to shift the tax on income earned by the corporation to the shareholder. There a parent corporation, Airco, had four wholly owned operating subsidiary corporations. It entered into a contract with each subsidiary providing in substance that the latter was employed as agent to manage and operate plants designed for the production of the products assigned to each, and as agent to sell the plant output. Airco was to furnish working capital, executive management and office facilities for each subsidiary. The subsidiary in turn agreed to pay to Airco all but a nominal amount of its profits.

Each subsidiary held title to the assets, including working capital, used in its business and each also showed on its books an account payable to Airco for their value without liability for interest. The officers of each subsidiary were also officers of Airco, and the directors of each subsidiary met only to ratify the actions of the directors and officers of Airco.

Airco considered the profits turned over to it by each subsidiary as its own income and reported it as such, while each subsidiary only reported the nominal retained amount. The Internal Revenue Service held the income to be taxable to the subsidiaries. The Tax Court held it taxable to Airco, but the court of appeals reversed it. In dealing with the issue, the Supreme Court first reaffirmed its decision in *Moline Properties* as holding that "a corporation formed or operated for business purposes must share the tax burden despite substantial identity, in practical operation, with its owner" and "[c]omplete ownership of the corporation, and the control primarily dependent on such ownership * * * are no

longer of significance in determining taxability." (*National Carbide Corp.*, 336 U.S. at 429, 69 S.Ct. at 730.)

The Court expressed its agreement with the view of the court of appeals that "when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference taxwise." (*Ibid.* at 431–32, 69 S.Ct. at 731.) As far as control is concerned it took note of the fact that the Internal Revenue Code taxes wholly owned corporations although—"Undoubtedly the great majority of corporations owned by sole stockholders are 'dummies' in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually." (*Ibid.* at 433, 69 S.Ct. at 732.) It explained that the fact that Airco provided the subsidiaries' funds and other assets did not make the assets any the less those of the subsidiaries and did not make the income earned by their utilization income to Airco, since loans and capital contributions are two of the ways in which corporations customarily derive their funds from stockholders. Nor did the contracts by which the subsidiaries agreed to pay substantially all of their profits to Airco make the income taxable to Airco, since basic income tax decisions require that income be taxed to those who earn it, despite anticipatory agreements designed to prevent vesting of the income in the earners.[3] (*Ibid.* at 433–36, 69 S.Ct. at 732–33.)

The Court conceded that there could be "'a true corporate agent or trustee * * * handling the property and income of its owner-principal without being taxable therefor", and listed some of the relevant considerations to be "[w]hether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and assets belonging to the principal." (*Ibid.* 336 U.S. at 437, 69 S.Ct. at 734.) But, it added, "If the corporation is a true agent, its relations with its principal *must not* be dependent upon the fact that it is owned by the principal," and "Its business purpose *must* be the carrying on of the normal duties of an agent." [Emphasis supplied.] (*Ibid.*)

What the Supreme Court found to be conclusive in *National Carbide* that the subsidiaries were not agents of Airco, despite the designation in the contracts, was that the subsidiaries and not Airco owned the assets which earned the income,[4] whatever the means by which the subsidiaries obtained them, and that "The entire earnings of petitioners, except for trifling amounts are turned over to Airco not because the latter could command this income if petitioners were owned by third persons, but because it owns and thus completely dominates the subsidiaries." (Ibid. at 438, 69 S.Ct. at 734.)

In *Roccaforte, Jr. v. Commissioner,* 52 AFTR 2d 83–5332, 5335 (5th Cir. July 5, 1983), the court described the Supreme Court's first four factors as general principles of agency law which serve only as "relevant considerations" in the determination of true agency status, but the latter two conditions as "mandatory and absolute." In *Harrison Property Man. Co. v. United States,* 201 Ct.Cl. 77, 85–86, 475 F.2d 623, 627 (1973), *cert. denied,* 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974), the Court of Claims read *National Carbide* to mean that despite the formal designation of "agency agreement" "the significant criteria, as we understand them, are whether the so-called 'agent' would have made the agreement if the so-called 'principals' were not its owners, and conversely whether the

---

3. The Court cited *Lucas v. Earl,* 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930) and *Helvering v. Clifford,* 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940) among other decisions.

4. The Court stated (336 U.S. at 437 n. 19, 69 S.Ct. at 734 n. 19):

   In the case of a subsidiary who supplies the labor and the capital with which the income is earned, as is true of petitioners here, it can hardly be contended that it did not earn the income.

'principals' would have undertaken the arrangement, if the 'agent' were not their corporate creature."

Applying the standards of *Moline Properties* to the facts of this case, it is clear, that Peppertree Apartments III Co. was a separate taxable entity apart from Cagle, plaintiff and the other partners. The corporation served various legitimate business purposes of its creators: holding title to the realty; assuming liability on the mortgage note so that no partner would have to do so; borrowing necessary funds to acquire and build the apartment project at market rates of interest which the partners could not legally bind themselves to pay; insulation of the general partner from personal liability incident to ownership of the apartment complex; and assuring continuity of title to the property and obligations on the mortgage note. Indeed, plaintiff does not dispute that Peppertree Apartments III Co. was a real corporation and taxable entity.

Applying the teaching of *National Carbide Corp.* to the same facts, it must also be concluded that, despite the nominee agreement, the corporation was not merely the agent of the partners and its losses were its own and not those of the partners (at least until the corporation was liquidated).

The record fails to reveal whether or not the corporation operated in its own name in dealing with the business' customers, the tenants of the apartment complex. However, there is evidence that at least some of the suppliers and contractors believed that they were dealing with the corporation since they brought suit against it for unpaid bills. More important, the undisputed evidence is that in obtaining the financing and title to the property the corporation operated in its own name rather than for the account of the partnership.

As for the corporation being able to bind the partnership by its actions, the only evidence is to the contrary. Only the corporation assumed the mortgage note and agreed to pay the rate of interest specified therein. In the event that the corporation defaulted, none of the partners was liable therefor.

The transmission to the partnership of money received by the corporation, if any, would not tend to prove or disprove agency on the facts in this case since it could have been a distribution to the owners of the corporation rather than an accounting by an agent to a principal. Plaintiff contends that only Cagle, and none of the partners, was the owner of the corporation, but this is not borne out by the record. At the time the partnership was formed Cagle and plaintiff were the only two partners. Stock was not issued to either of them, but both became officers. Since the use of the corporation as owner and obligor on the note was an integral part of the limited partnership's plan for the acquisition of the apartment project, it is a fair inference that, whoever may be deemed the stockholder or stockholders, the corporation was owned on behalf of all the partners.

With respect to whether the corporation or the partnership owned the assets which produced the losses, it is clear that the corporation did. That the partnership provided some of the funds does not detract from the significance of this fact. As *National Carbide Corp.*, noted, owners contribute the capital which corporations use in their operations. The corporation could not have obtained the financing unless it owned the property and could mortgage it to secure its note. The fact that the partners were the beneficiaries of such ownership is no different than in the case of any closely held corporation or any business corporation for that matter. Such was equally the fact with respect to the owners of the corporations in *Moline Properties* and *National Carbide Corp.* As *National Carbide* makes clear, the fact that the corporation owned the property which earned the income or produced the loss is virtually conclusive that such income or loss was its own and not that of a purported principal.

Next turning to the test which the Court in *National Carbide Corp.* thought most important, "If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it [the corporation] is owned by the principal" (336 U.S. at 437, 69 S.Ct. at 734), it is apparent that

the corporation would not have been willing to enter into the agreement which it did with the partners if the latter did not own and control it. The corporation agreed to turn over to the partnership all of its profits earned with property owned by it without *quid pro quo*. This is ordinarily denominated a dividend or redemption. The corporation also agreed to assume liability for the funds used to acquire such property. Again, an agent would not ordinarily do this for a principal without consideration in an arms length transaction, although a wholly owned corporation might. Furthermore, an agent in an arms length transaction would not normally agree to perform services for its principal without compensation, although a wholly owned corporation could be expected to do so for its owners.

Finally, the use of the corporation as a mere agent of the partners could hardly have served the latter's purpose. The corporation assumed liability for the entire amount of the mortgage note. Nothing in the record indicates that any of the partners intended that the corporation be authorized as agent to commit him to full recourse liability in excess of the value of the mortgaged property. Furthermore, the corporation agreed to borrow the funds at a rate of interest in excess of what the partners could legally pay under the Iowa usury law. It is not reasonable to infer that the bank making the permanent mortgage loan would have been willing to lend the money to the partners as individuals at a rate which would have been unlawful or uncollectible merely because the partners signed the note through an agent. Indeed, the record reflects that the bank was not informed nor interested in being informed of any such thing. For this reason, too, it must be concluded that the corporation's action was that of a wholly owned corporation for the benefit of its owners rather than that of an agent on behalf of its principal.

We also take note of the fact that the precise claim herein—that a corporation used to obtain financing for the benefit of apartment project developers at interest rates which would be usurious for the developers is a nontaxable agent of the developers—has been rejected in several other cases. *Roccaforte, Jr. v. Commissioner, supra; Jones v. Commissioner,* 640 F.2d 745 (5th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 507, 70 L.Ed.2d 381 (1981); and *Collins v. United States,* 386 F.Supp. 17 (S.D.Ga. 1974), *aff'd per curiam,* 514 F.2d 1282 (5th Cir.1975); and *see also Crouch v. United States,* 692 F.2d 97 (10th Cir.1982); *Ogiony v. Commissioner,* 617 F.2d 14 (2nd Cir.), *cert. denied,* 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980). Plaintiff concedes that "the facts of *Roccaforte, supra,* are essentially the same as the case at bar." There after reiterating its reliance upon the reasoning of *National Carbide Corp.,* the court explained (52 AFTR 2d at 83–5335–36):

> Our holding today is also supported by strong policy considerations. Closely-held corporations often function as agents or surrogates for their owners. Under Moline, however, they are treated as separate, taxable entities. If a taxpayer could, by the simple expedient of relying upon characteristics common to all such corporations, avoid tax liability, the separate entity regime would collapse. To prevent abuse, the taxpayer should be required to show more than those agency attributes that arise naturally from ownership and control of the corporation—he should be required to show that an agency relationship could exist independent of such ownership and control. This is precisely what the mandatory fifth condition of National Carbide requires.[5]

5. Plaintiff cites *Carver v. United States,* 188 Ct.Cl. 202, 213–14, 412 F.2d 233, 240 (1969), as a decision wherein the court held a corporation to be the agent for its stockholder. However, the facts in that case do not resemble those herein. There, with respect to one of the transactions at issue, the court found that the corporation was used merely as a straw holder in a joint acquisition of realty by its stockholder and an unrelated third party merely to conceal the identity of the joint owners and to facilitate conveyance by simplifying the number of signatures needed. After the Internal Revenue Service ruled that the third party's pro rata gain on the sale of the joint interest was not taxable to the corporation, the court held that

*Conclusion*

Defendant is entitled to judgment dismissing the complaint. Accordingly, the clerk is directed to enter judgment to that effect.

there was no greater reason for taxing the corporation on the stockholder's share of the