FLORENZ R. OURISMAN AND BETTY JOAN OURISMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4644–78.     Filed January 26, 1984.

*Lipman Redman, Jerry M. Hamovit,* and *Stephen D. Kahn,* for the petitioners.

*Joyce H. Errecart,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Year | Deficiency |
|---|---|
| 1970 | $95,183.04 |
| 1971 | 998,554.81 |
| 1972 | 49,729.12 |

The issues for decision are: (1) Whether the losses generated by the construction and operation of an office building are attributable to the partnership which constructed and operated such building or to a corporation which was created to act as an agent for such partnership for certain limited purposes; (2) if such losses are attributable to the corporation, whether its reconveyance to the partnership of record title of a leasehold in the land upon which the building was constructed constituted a distribution in liquidation; and (3) whether the corporation was a collapsible corporation within the meaning of section 341(b) of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Most of the facts have been stipulated, and those facts are so found.

The petitioners, Florenz Ourisman and Betty Joan Ourisman, were husband and wife during the years in issue. Mr. Ourisman resided in Washington, D.C., and Mrs. Ourisman resided in Bethesda, Md., when they filed the petition in this case.[2] The petitioners filed joint Federal income tax returns for 1970, 1971, and 1972 with the Internal Revenue Service Center in Philadelphia, Pa. For each of the years in issue, 5225 Wisconsin Associates (the partnership), a District of Columbia limited partnership, filed a Form 1065, U.S. Partnership Return of Income, with the Internal Revenue Service Center in Philadelphia, Pa.

During the years in issue, Mr. Ourisman was engaged in the real estate business as an investor and developer. During 1969, he and the Donohoe Construction Co., Inc. (Donohoe), explored the possibility of constructing an office building on upper Wisconsin Avenue, N.W., in the District of Columbia. They learned that property located at 5225 Wisconsin Avenue was available for lease, and on October 18, 1969, Mr. Ourisman and Donohoe, as tenants, entered into a 99-year ground lease of such property.

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[2] In their petition, the petitioners alleged that they were both legal residents of Bethesda, Md. The Commissioner admitted such allegation. However, the stipulation of facts provides otherwise, and we have relied on the stipulation of facts for our conclusion.

Mr. Ourisman and officials of Donohoe sought construction financing in order to develop the property with a six-story office building. Together, they submitted a request for a loan in the amount of $3,500,000 to American Security & Trust Co. (AS & T). Such application listed the "owner" of the property as the Wisconsin-Jenifer Joint Venture, a partnership in which Mr. Ourisman had an 80-percent share and Donohoe had a 20-percent share. The Wisconsin-Jenifer Joint Venture was the partnership that eventually became 5225 Wisconsin Associates. On January 9, 1970, a commitment was given for AS & T to provide interim financing in the amount of $3,150,000 at an interest rate of 10 percent. The commitment provided that the loan would be made to the "Corporate Nominee of Wisconsin-Jenifer Joint Venture" and would be secured by a first deed of trust on the Wisconsin Avenue property. By February 3, 1970, the partnership and AS & T had agreed to the final details of the construction loan.

During 1970, District of Columbia law provided that a loan made to a noncorporate borrower at a rate exceeding 8 percent was usurious. 28 D.C. Code sec. 3301. At such time, the prevailing local interest rate for construction loans was approximately 10 percent. In order to make the construction loan, AS & T required that a nominal debtor be the corporate nominee of the partnership and that, accordingly, record title to the leasehold be held by the corporate borrower. On February 5, 1970, Mr. Ourisman and Donohoe formed Wisconsin-Jenifer, Inc. (the corporation), a District of Columbia corporation. The articles of incorporation specified that the corporation had broad powers to deal with real estate and engage in activities related to real estate development. On the same day, the corporation's board of directors, consisting of Mr. and Mrs. Ourisman and Richard Donohoe, president of Donohoe, resolved that the corporation would act as nominee or agent for the partnership:

To purchase, acquire, hold, improve, operate, sell, convey, and assign title to real and personal property, all as a nominee for a principal or principals;

To borrow or raise money for any of the purposes of the corporation, and to secure the payment thereof, and of the interest thereon, to execute mortgages or to pledge, convey or give an assignment or deed in trust of the whole, or any part of any real or personal property, including contracts, choses in action or other intangible property of the corporation;

To carry out any part of the foregoing objects, as nominee or agent, either alone or through or in conjunction with any person, firm, association or corporation, and in any part of the world, and, in carrying on its business and for the purposes herein specified, or which at any time may appear conducive to or expedient for the accomplishment of any such purposes.

The construction loan was closed on May 7, 1970. On that date, Mr. Ourisman and Donohoe executed an agreement creating 5225 Wisconsin Associates, a limited partnership. The partnership certificate provided that the business of the partnership was to acquire the leasehold and construct and operate an office building on the premises. Also on May 7, 1970, the partnership assigned the leasehold to the corporation. The assignment, which recited a consideration of $10, was recorded the next day. The corporation agreed that it would hold the lease and any improvements constructed on the leased property, borrow and repay interim financing from AS & T, and erect a six-story office building "solely as nominee, dummy and straw party for the Partnership, and the Partnership is and shall continue to be the Corporation's principal, the true and lawful owner of the leasehold conveyed to the Corporation * * * together with all improvements erected thereon, and the real party in interest in the aforesaid agreements and transactions." The agreement also recited a consideration of $10.

Mr. Ourisman and Donohoe intended to retain all but record title to the leasehold and building, and they intended that the corporation would reconvey record title to the partnership as soon as such reconveyance was practical. The partners always regarded themselves as the real owners of the property.

The corporation, as borrower, signed the construction loan agreement with AS & T, as well as a promissory note and a deed of trust. Mr. Ourisman and the principal shareholders of Donohoe personally guaranteed payment of the construction loan. The bank regarded Mr. Ourisman and Donohoe as the true debtors and looked to them for repayment. Finally, on May 7, 1970, the partnership agreed with John F. Donohoe & Sons, Inc., that the latter would act as its leasing and management agent for the building to be erected on the Wisconsin Avenue property.

Between May 1970 and November 1971, the partnership executed 17 leases with prospective tenants of the office

building, designating itself as the owner of the leasehold. The contracts with the architects for the design of the building listed the owners as Mr. Ourisman and Donohoe, individually or as partners. The insurance policy obtained for the project listed as the insured the "Wisconsin-Jenifer, Joint Venture Etal." On applications made to the District of Columbia for certificates of occupancy, the partnership identified itself as the owner of the premises.

Donohoe acted as the general contractor for construction of the building. While the building was under construction, Mr. Ourisman and Donohoe sought permanent financing. On March 15, 1971, they applied to Jefferson Federal Savings & Loan Association (Jefferson) for a permanent loan. Their application was made in the name of the corporation, but specified that Mr. Ourisman and Donohoe were the owners of the building. Jefferson agreed to provide permanent financing in the amount of $3,650,000.

On October 28, 1971, the corporate board of directors resolved that it secure the permanent financing from Jefferson, "acting solely, however, as the nominee and at the direction of the owner of said leasehold estate, 5225 Wisconsin Associates." The permanent loan was closed on November 4, 1971. The loan carried an interest rate of 8½ percent, and the corporation was the nominal borrower. There was no personal liability on the note; Jefferson was secured by a deed of trust on the property. Also on November 4, 1971, the corporation reassigned the leasehold to the partnership. The assignment, which recited a consideration of $10, was recorded on the same day. On June 28, 1972, the corporation dissolved.

During its existence, the corporation never opened a bank account. When loan proceeds were periodically advanced to it, the corporation endorsed the checks to the partnership. The partnership made all interest and principal payments to AS & T and Jefferson. The partnership paid every expense, including legal, accounting, and bonding costs, associated with the project. The partnership contracted for all building utilities in its own name and paid all utility bills. On its income tax returns for 1970 and 1971, the corporation reported no income, listed no assets or liabilities, and stated that its business was "Corporate Nominee." No capital was ever paid into the corporation, and it never issued any stock. The corporation

made no distributions prior to November 4, 1971. The corporation received no rental income; instead, the management agent collected such rents and distributed them to the partnership. The corporation did not perform any services for any parties other than the partnership.

On its returns for 1970, 1971, and 1972, the partnership claimed losses attributable to the holding of the ground lease and the construction and operation of the building. On their returns for such years, the petitioners deducted their share of such losses. In his notice of deficiency, the Commissioner disallowed such deductions, determining that the partnership was not entitled to deduct expenses incurred during 1970 and most of 1971 in the holding of the lease and the construction and operation of the office building. He determined that such losses were those of the corporation. Accordingly, the Commissioner also determined that income earned from the project during 1971 was attributable to the corporation. He also determined that the petitioners realized ordinary gain as a result of liquidating distributions that they received from the corporation during 1970 and 1971. The Commissioner determined that, in 1971, the corporation had distributed all its assets to the partnership and that the corporation was a collapsible corporation so that the gain on the liquidation was ordinary income.[3]

## OPINION

The first issue for decision is whether the losses generated by the construction and operation of the office building are attributable to the corporation or to the individual partners in the partnership. The petitioners argue that the corporation acted solely as the agent of the partnership, holding record title to the leasehold and obtaining project financing on behalf of the partnership only in order to comply with local usury restrictions. Thus, they conclude that the partnership, as the principal, is the entity which is responsible for the tax consequences of the construction project. However, the Commissioner contends that there was no agency relationship,

---

[3]The notice also raised issues concerning project depreciation and the amount received by Mr. Ourisman on the liquidation of the corporation. However, those matters, if they become relevant under our decision, have been settled by stipulation of the parties.

recognized for tax purposes, between the corporation and the partnership and that the losses generated by the project are properly attributable to the corporation.

The principles guiding our decision were set forth by the Supreme Court in *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), and *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949). In *Moline Properties*, the Supreme Court considered the argument that a corporation was the nontaxable agent of its owner. In that case, one Mr. Thompson created a corporation at the urging of his mortgagee. The corporation took title to Mr. Thompson's real estate and assumed his mortgage debt. The mortgagee initially controlled the corporation, but Mr. Thompson assumed control upon the refinancing of the obligation with a different lender. The corporation instituted and defended lawsuits concerning its holdings, leased a portion of the realty, and ultimately disposed of its holdings. The corporation sought to avoid taxation on the gain by arguing that it was taxable to Mr. Thompson; the Commissioner contended that the gain was taxable to the corporation.

The Supreme Court rejected the taxpayer's contention that the corporation should not be regarded as a separate viable entity for tax purposes. The Court stated:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [319 U.S. at 438-439; fn. refs. omitted.]

The Court found that the corporation had served Mr. Thompson's business interests and engaged in business activity from its creation and that the corporation was thus a separate taxable entity.[4] The Court also rejected the contention that the

---

[4]The petitioners in the present case do not contend that the corporation was a purely passive dummy which should be disregarded for tax purposes. See *Jackson v. Commissioner*, 233 F.2d 289 (2d Cir. 1956), affg. 24 T.C. 1 (1955); *Paymer v. Commissioner*, 150 F.2d 334 (2d Cir. 1945), revg. on this issue a Memorandum Opinion of this Court; *Bartell Hotel Co. v. Commissioner*, 32 T.C. 311 (1959); *Mulligan v. Commissioner*, 16 T.C. 1489 (1951); *K–C Land Co. v. Commissioner*, T.C. Memo. 1960-35. In any event, such an argument is apparently foreclosed by more recent decisions holding that use of the corporate form to avoid State usury restrictions is a "business purpose" sufficient to render the corporation a viable entity for income tax purposes. *Moline Properties, Inc. v.*

corporation acted as Mr. Thompson's agent, stating, "There was no actual contract of agency, nor the usual incidents of an agency relationship. Surely the mere fact of the existence of a corporation with one or several stockholders, regardless of the corporation's business activities, does not make the corporation the agent of its stockholders." 319 U.S. at 440.

In *National Carbide Corp. v. Commissioner, supra,* the Supreme Court again faced the corporate agency issue. In that case, the Air Reduction Corp. (Airco) used four wholly owned subsidiaries to conduct its manufacturing and selling operations. Airco's contracts with the subsidiaries provided that such companies operated as Airco's agents. Airco adopted such arrangement for nontax business reasons. Airco furnished the subsidiaries with working capital, management, and offices and also financed the assets that the subsidiaries used in their operations. The subsidiaries held title to such assets. The subsidiaries turned over all but the nominal amount of their profits to Airco, which reported such profits as its own income. The Supreme Court held that the subsidiaries were taxable on all their earnings.

In *National Carbide,* the Court reiterated its holding in *Moline Properties* that ownership and control alone will not make a corporation the agent of its shareholders. The Court further stated that the contracts under which the subsidiaries operated were not agency contracts. The Court emphasized that the subsidiaries earned the income and that they could not shift their tax liability through contracts effecting an anticipatory assignment of income. The Court continued:

> What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. Whether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its

*Commissioner,* 319 U.S. 436 (1943); see *Crouch v. United States,* 692 F.2d 97, 99 (10th Cir. 1982); *Ogiony v. Commissioner,* 617 F.2d 14 (2d Cir. 1980), affg. a Memorandum Opinion of this Court; *Evans v. Commissioner,* 557 F.2d 1095, 1099 (5th Cir. 1977), affg. on this issue a Memorandum Opinion of this Court; *Lane v. United States,* 535 F. Supp. 397, 401 (S.D. Miss. 1981), *Collins v. United States,* 386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F.2d 1282 (5th Cir. 1975); *Strong v. Commissioner,* 66 T.C. 12 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977); *Bolger v. Commissioner,* 59 T.C. 760, 766 (1973).

principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent. * * * [336 U.S. at 437; fn. refs. omitted.]

The Court determined that the absence of indicia of agency and the essentiality of ownership of the corporation to any "agency" relationship demonstrated the fallacy of the taxpayer's agency argument. The Court noted that the subsidiaries owned assets worth nearly $20 million, earned $4.5 million on net sales of $22 million, and had thousands of employees. The Court stated "The entire earnings of petitioners, except for trifling amounts, are turned over to Airco not because the latter could command this income if petitioners were owned by third persons, but because it owns and thus completely dominates the subsidiaries." 336 U.S. at 438. The Court concluded that Airco's ownership and control of the subsidiaries did not make the subsidiaries its agents.

In applying the standards enunciated in *Moline Properties* and *National Carbide*, the courts have generally refused to find an agency where they concluded that the relations between the corporation and its owners were entirely consistent with the usual control exercised by shareholders over a corporation. The facts of the cases have varied in detail, but several patterns have recurred: the shareholders created the corporation to develop or manage their property; the corporation acted only for its owners; the corporation turned over to its owners all the profits earned by it on property to which it held title; the corporation assumed liability for the loans used to finance the property; and the corporation acted without remuneration. See generally *Jones v. Commissioner*, 640 F.2d 745 (5th Cir. 1981), affg. a Memorandum Opinion of this Court; *Greer v. Commissioner*, 334 F.2d 20 (5th Cir. 1964), affg. a Memorandum Opinion of this Court; *Harrison Property Management Co. v. United States*, 201 Ct. Cl. 77, 475 F.2d 623 (1973); *Vaughn v. United States*, 3 Cl. Ct. 316 (1983); *Stillman v. Commissioner*, 60 T.C. 897 (1973); *Bolger v. Commissioner*, 59 T.C. 760 (1973); *Collins v. United States*, 386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F.2d 1282 (5th Cir. 1975).

A corporation has been held to be a nontaxable agent in some cases: For example, a corporation was found to be the agent of its owners when it represented unrelated parties, as well as its owners, in the same transactions. *Raphan v. United*

*States*, 3 Cl. Ct. 457 (1983); *Carver v. United States*, 188 Ct. Cl. 202, 412 F.2d 233 (1969). The courts reasoned that since the corporation was clearly the agent of the unrelated parties, and since it represented the owners and nonowners in the same manner, then the corporation was also the agent of its owners. Additionally, where a corporation held record title only at the moments it executed the interim and permanent borrowings, and the owner held record title at all other times during the development of an apartment project, the owner was allowed the deductions attributable to the project. *Schlosberg v. United States*, an unreported case (E.D. Va. 1981, 47 AFTR 2d 81–1208, 81–1 USTC par. 9272). After examining the plethora of cases following *Moline Properties* and *National Carbide*, Bittker and Eustice concluded:

that the corporation must establish that it is an agent for its shareholders (with respect to the transactions in question) by evidence other than the control which shareholders automatically possess over their corporations. If the corporation merely holds title to property, and the management functions are carried on by the shareholders, it is comparatively easy to infer that the corporation is acting only as an agent or nominee. * * * [B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 2–10, at 2–28—2–29 (4th ed. 1979); fn. ref. omitted.]

We carefully considered the issue of whether a corporation was to be treated as a nontaxable agent in *Roccaforte v. Commissioner*, 77 T.C. 263 (1981), revd. 708 F.2d 986 (5th Cir. 1983), a Court-reviewed opinion. The taxpayers therein formed a partnership to build and operate an apartment complex on land owned by them. The prospective construction and interim lenders required that the nominal borrower be a corporation in order to avoid State usury limitations. The partners formed a corporation and executed an agreement with it providing that the corporation was to act only as agent for the partnership to obtain financing, that the partners remained the owners of the realty, and that the corporation could act only upon the authorization of the partners. The partners agreed to indemnify and hold the corporation harmless for all acts and debts related to the apartment complex, and the partners agreed that they, not the corporation, would be liable for all loans and mortgages on the property. The corporation acquired record title to the realty and executed both the construction and permanent loans. Several of the partners

personally guaranteed both loans. The corporate creditors were all aware that the corporation represented the partnership. The corporation executed the construction and maintained a checking account in which it deposited loan advances and from which it made interest and progress payments. The corporation had no assets, liabilities, income, or expenses; nor did it manage the apartment complex once the building was placed in service.

In *Roccaforte*, we decided that in the *National Carbide* case, the Supreme Court had established six criteria or indicia of agency to be applied to the facts of the case. We found that the corporation acted in the name and for the account of the partnership, that it bound the partnership by its actions, that income derived from the project was attributable to the employees and assets of the partnership (since the corporation had no employees and held only record title to the realty), and that all corporate activities were consistent with the normal duties of an agent. We determined that the third *National Carbide* factor, whether the agent transmits all receipts to the principal, was inapplicable. 77 T.C. at 283–287. Although we found that the corporation's relations with the partnership were "based upon the partners' ownership and control of both entities" (77 T.C. at 287), we concluded that the petitioners had proved the existence of a true corporate agency by evidence independent of such control. Consequently, we held that the corporation was the agent of the partnership.

Application of the indicia of agency specified in *National Carbide*, as we interpreted them in *Roccaforte*, to the facts of the present case compels the conclusion that the corporation acted as the partnership's agent in the construction and operation of the office building. The corporation acted in the name and for the account of the partnership. The corporation was created at the insistence of the construction lender, which required that the loan be made to the corporate nominee of the partnership. Although the powers of the corporation were broadly stated in its certificate of incorporation, the directors adopted a resolution that the corporation would acquire title to realty and borrow money only as a nominee. The agreement with the partnership also provided that the corporation would acquire the leasehold, obtain the necessary financing, and erect an office building solely as the nominee of the partner-

ship, which would remain the corporation's principal and the true owner of the leasehold and improvements. Although *National Carbide* makes clear that such an agreement is not conclusive proof of agency, the agency agreement explains the activities of the corporation and supports the position of the petitioners.[5] The construction loan application listed the partnership as the owner of the project, and the permanent loan application listed Mr. Ourisman and Donohoe as the applicants. Both Mr. Ourisman and Donohoe personally guaranteed the construction loan, and AS & T was fully aware that the partners were the true debtors to be looked to for repayment. Everyone else connected with the project knew that, although the corporation held record title to the leasehold and improvements, the partnership was the true owner of the project. On its Federal income tax returns, the corporation listed its business as "Corporate Nominee." The partnership was listed as landlord and owner of the project of all tenant leases and on the certificates of occupancy filed with the District of Columbia. The partnership was the named insured in the project insurance policy. The partnership executed the architects' contracts, executed the leasing and management agreements, and contracted for and paid all project expenses. In summary, there was never any doubt that the corporation was acting as the partnership's representative.

The corporation also bound the partnership by its actions. As set forth above, the project creditors were all aware that the corporation was acting for the partnership. The agency agreement provided that the partnership remained the real party in interest with respect to the project; Mr. Ourisman and Donohoe personally guaranteed the construction loan. The partners obviously considered themselves bound by the acts of the corporation. The partnership made all principal and interest payments on the loan and paid all other expenses associated with the project.

The third agency factor specified by the Supreme Court in *National Carbide* is whether the corporation transmitted its

---

[5]The Commissioner contends that the agency agreement should be ignored because it lacked consideration, but an agency agreement may be enforced without consideration. Restatement 2d, Agency, sec. 16; see also *Central Trust Co., Rochester, N.Y. v. Sheahen*, 66 App. Div. 2d 1015, 411 N.Y.S.2d 741 (4th Dept. 1978); *Pease & Elliman v. Wegeman*, 223 App. Div. 682, 229 N.Y.S. 398 (1st Dept. 1928).

receipts to the partnership. In the present case, as in *Roccaforte* (77 T.C. at 286), such factor is of limited applicability. The corporation had no bank account, and John F. Donohoe & Sons, Inc., acted as management and leasing agent for the project. The only funds which passed through the corporation were the construction loan advances, and the corporation immediately endorsed such checks to the partnership. Accordingly, to the extent the third *National Carbide* factor has any applicability to the present case, it supports a finding of agency.

The fourth agency criterion is whether the income received from the office building was attributable to the employees and assets of the partnership. The corporation had no employees and no assets beyond record title to the leasehold and building. Mr. Ourisman and Donohoe acquired the leasehold before they formed the corporation, and they, acting individually or as members of the partnership directly or through agents chosen by them, performed the activities necessary to arrange for the construction and operation of the building, including making the applications for the financing, making the contracts for the construction of the building, executing the contracts for the architects, executing the leases, and paying the costs of constructing and operating the building. The partnership remained the owner of the leasehold and building. See *Roccaforte v. Commissioner*, 77 T.C. at 286. The corporation's only activities consisted of holding record title, executing the necessary loan documents, and endorsing loan advances to the partners. On this record, we conclude that the income realized from the building was attributable to the efforts and assets of the partners.

The sixth *National Carbide* factor is whether the corporation's business purpose and activities consisted of the carrying on of the normal duties of an agent. In its resolution, in the agreement, and in its Federal tax return, the corporation declared that its purpose was to act as a nominee or agent. As our analysis of the other factors makes clear, the corporation's activities with respect to the project were at all times consistent with its status as an agent. The corporation did nothing that could be interpreted as an assertion of principalship. For the reasons set forth in *Roccaforte v. Commissioner*, 77 T.C. at 287, we conclude that this factor also favors the petitioners.

In the present case, as in *Roccaforte*, we conclude that, regarding the fifth *National Carbide* factor, the corporation's relations with the partners were based, to a certain extent, upon the control which the partners, as shareholders, exercised over the corporation. Although it appears that no stock was ever issued, the corporate minutes reveal that Mr. Ourisman was regarded as owning 80 percent of the corporation and that Donohoe was viewed as a 20-percent shareholder. Such interests in the corporation coincided with the partners' interests in the partnership. Moreover, the corporation was not compensated for the services that it performed, and it acted for no other principal. Under the circumstances, we cannot conclude that the partnership and the corporation bargained at arm's length for the latter's services as agent.

Despite our determination regarding the fifth *National Carbide* factor, we conclude, as we did in *Roccaforte*, that the petitioners have clearly established that the corporation acted as the partnership's agent in the construction and operation of the office building:

> We are convinced that the investors desired to operate in partnership form and were forced to form a corporation to comply with the State's usury laws. The partners did not attempt to avail themselves of the normal benefits of the corporate form such as limited liability. Rather, the partners remained subject to the claims of creditors and to all other claims arising out of the apartment project.
>
> We believe that the entire substance of the arrangement was one of an agency relationship, and even the form (outside of the corporation's primary liability on the mortgages) indicated the agency relationship that was intended. We are not presented here with the use of a corporation as a tax-avoidance scheme. Rather, the partners were forced to form a corporation in order to get financing for their project. They sought none of the traditional insulating benefits of a corporate shareholder. In substance, the partners were the true economic owners of the property with all the risks and benefits attendant thereto. In such cases, where the corporation was formed solely to satisfy the requirement of the bank in complying with State usury laws and the indicia of an agency relationship are present, we will respect the status of the corporation as an agent of the partnership. [77 T.C. at 278–288; fn. ref. omitted.]

The present case is indistinguishable from *Roccaforte*, but we must decide whether to continue to follow our decision in *Roccaforte*, since the Fifth Circuit reversed the decision of this Court (708 F.2d 986 (1983)). Although that court agreed with our factual determinations regarding each of the *National*

*Carbide* agency criteria, it held that we could not find that the corporation was acting as an agent since we had concluded that the corporate relations with the partnership were based on the partners' control of the corporation. The Fifth Circuit held that the fifth criterion of *National Carbide* is decisive and that whenever such control is present, the corporation cannot be found to be an agent. 708 F.2d at 989–990. Accordingly, that court concluded, as a matter of law, that since the corporation had failed to satisfy the fifth factor, it was not a nontaxable agent. The Fifth Circuit also stated that tax policy considerations supported its conclusion: "If a taxpayer could, by the simple expedient of relying upon characteristics common to all such corporations, avoid tax liability, the separate entity regime would collapse." 708 F.2d at 990.[6]

We have carefully reexamined our position in light of the views expressed by the Fifth Circuit, but with due respect to that court, we are not convinced that our position should be changed. Since venue for appeal of the present case is to either the Fourth Circuit or the District of Columbia Circuit, we are not required to follow the Fifth Circuit's decision in *Roccaforte. Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

We disagree with the Fifth Circuit's interpretation of *National Carbide* as applied to the facts of *Roccaforte.* The Supreme Court did not intend to create a "factor checklist" to be mechanically applied to the facts of each case, and we do not believe that the "fifth factor" is "mandatory and absolute." 708 F.2d at 989. The one crucial question under *National Carbide* concerns the essential nature of the relationship between the purported corporate agent and its shareholders. *Raphan v. United States, supra.* The Supreme Court expressly recognized that a corporation could act as an agent for its owners under certain circumstances (336 U.S. at 437) and specified the indicia of a true agency relationship. There is no indication that the Court intended to deny a corporation the status of agent for its shareholders in spite of the presence of the indicia of agency (factors one through four) merely because the agency is to some extent based upon the share-

---

[6]See also *Jones v. Commissioner*, 640 F.2d 745 (5th Cir. 1981), affg. a Memorandum Opinion of this Court; *Vaughn v. United States*, 3 Cl. Ct. 316 (1983); *Collins v. United States*, 386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F.2d 1282 (5th Cir. 1975).

holders' control of the corporation (factor five). Yet, in every case, the shareholders can control their corporation, and the adoption of the view of the Fifth Circuit would appear to lead to the conclusion that the corporation could not constitute the agent of its shareholders, despite other indicia of an agency relationship. When the Supreme Court stated that the corporation's relations with its principal "must not be dependent upon the fact that it is owned by the principal" (336 U.S. at 437), the Court was merely reiterating its holding in *Moline Properties* that any such agency must be proved by "evidence other than the control which shareholders automatically possess over their corporations." B. Bittker & J. Eustice, *supra* at 2–28. In other words, the taxpayer must prove that the agency existed independently of the shareholders' ownership and control. In the present case, the petitioners have sustained such burden.

The corporation was formed solely to secure construction and permanent financing. The corporation held record title to the leasehold and improvements and executed the borrowings because the lenders required it to do so. The partners did not seek to avoid the burdens of a principal; on the contrary, they continued to act as principals with respect to every aspect of the construction project. No party to the borrowings believed that the corporation, a shell with no assets or income, would repay the loans. The partners personally guaranteed the construction loan, and the partnership repaid such loan. Likewise, the activities of the corporation were minimal— acceptance of the legal title to the leasehold, securing the construction and permanent loans, and thereafter conveyance of the title back to the partners. The corporation can in no way be said to have earned the project income or incurred the project losses; the partnership remained the beneficial owner of the project at all times, and the earnings and losses related thereto were generated solely by the partnership's efforts and assets. Except for the fact that the corporation acted only for its shareholders and that it was not compensated, corporation acted no differently than an independent agent. See *Raphan v. United States*, 3 Cl. Ct. at 463 ("Moreover, the narrow purpose of the agency agreement—holding nominal title to avoid usury problems—could have been performed equally well by a corporation unrelated to any of the parties"). We refuse to

treat the corporation as if it were the tax owner of the project during 1970 and 1971 merely because the partnership may not have bargained with it for its services at arm's length. If a corporation is ever to be recognized for tax purposes as the agent of its shareholders, the circumstances of this case compel the conclusion that this corporation should be so recognized. See generally J. Miller, "The Nominee Conundrum: The Live Dummy is Dead, but the Dead Dummy Should Live!" 34 Tax L. Rev. 213 (1979); see also E. Baker & H. Rothman, "Nominee and Agency Corporations: Grasping for Straws," 33 N.Y.U. Inst. on Fed. Tax. 1255 (1975); S. Kronovet, "Straw Corporations: When Will They Be Recognized; What Can and Should Be Done," 39 J. Tax 54 (1973); J. Kurtz & C. Kopp, "Taxability of Straw Corporations in Real Estate Transactions," 22 Tax Law. 647 (1969).

Nor are we convinced that our holding herein presages the downfall of the corporate income tax. The Fifth Circuit's argument that our holdings in *Roccaforte* and herein may permit any closely held corporation to qualify as a nontaxable agent is unfounded. The rule of *Moline Properties*, that the corporate entity will generally be respected for tax purposes, is unshaken by our decisions. See *Strong v. Commissioner*, 66 T.C. 12 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977). Nevertheless, a corporation that is a viable tax entity may still act as the agent of its owners in the circumstances specified in *National Carbide*. In contrast to the facts of the present case, most closely held corporations are formed precisely because their owners wish to *avoid*, for whatever reason, the burdens of a principal. To argue that our decision herein permits all closely held corporations to avoid tax as the agents of their shareholders is to ignore the strictures of *National Carbide*. We have concluded that the corporation in this case was acting as an agent for its shareholders because it carried on only negligible activities, all persons dealing with it were aware that it was acting as an agent, and the substantial activities involved in constructing and operating the building were performed by the partners. Those conditions could not be satisfied by most closely held corporations, and not to collect the corporate income tax when such conditions are satisfied will clearly make no significant difference in the scheme of Federal taxation.

Under the circumstances of this case, we hold that the corporation was the agent of the partnership and that the losses generated by the project are attributable to the partnership and hence to the partners. *Roccaforte v. Commissioner, supra; Schlosberg v. United States*, an unreported case (E.D. Va. 1981, 47 AFTR 2d 81–1208, 81–1 USTC par. 9272). Our determination that the corporation was not the owner of the project for tax purposes during the years in issue renders it unnecessary for us to resolve the remaining issues. To reflect concessions by the parties,

*Decision will be entered under Rule 155.*

Reviewed by the Court.
WHITAKER, *J.*, abstained.

---

SWIFT, *J.*, concurring: I agree with the holding of the majority but wish to comment on their analysis of the *National Carbide* fifth factor as it applies to this case. I understand that factor simply to require that the corporation's status as agent vis à vis its principal in the transaction in question must rise to the level of a relationship which stands on its own. In the language of the Supreme Court—

If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal. * * * [*National Carbide Corp. v. Commissioner*, 336 U.S. at 437.]

The majority herein, the Fifth Circuit in *Roccaforte v. Commissioner*, 708 F.2d 986 (1983), and the Court of Claims in *Harrison Property Management Co. v. United States*, 475 F.2d 623 (1973), cert. denied 414 U.S. 1130 (1974), place excessive emphasis on the ownership of the corporate agent by the principal in evaluating this factor.

A proper application of the *National Carbide* fifth factor should focus on the manner and degree the agency was represented to third parties and the degree to which third parties acted in reliance upon the agency relationship. If the agency representations and third-party reliance thereon were significant, it should be concluded that the agency relationship

achieved a legal stature sufficiently independent of the control of the principals to satisfy the *National Carbide* fifth factor. Once the agency representations and third-party reliance thereon are established, it is not meaningful or realistic to require that the agent corporation also must have received a fee for its nominal services as agent or to require that it acted as agent for others.[1]

In this case, the numerous third parties who were aware of the transaction uniformly were advised of the agency relationship. They relied and acted upon its existence and clearly would have been in a position to sue for whatever damages might have been incurred if either the corporate agency or its principals had sought to avoid the various transactions which were entered into in reliance upon that agency. A commercial bank, a savings and loan association, a real estate management company, commercial tenants, an insurance company, the District of Columbia, and various public utility companies all entered into specific contracts with the principal and/or the corporate agent in their respective capacities and thereafter could have held the principal and the agent liable for their actions in their respective capacities as principals and agent.

Although the agency relationship may have been established initially, on February 5, 1970, solely because of the shareholder status of the principal, the agent's relations with the principal and with the third parties thereafter (throughout the balance of 1970, 1971, and the first 6 months of 1972 until the agency was dissolved on June 28, 1972) were consistent with its agency status and provided a substantial, independent stature to that relationship.

Accordingly, I expressly would find that the *National Carbide* fifth factor was satisfied along with the other five factors.

HAMBLEN, *J.*, agrees with this concurring opinion.

---

[1]A thoughtful discussion of the *National Carbide* fifth factor is found in Note, "The use of Corporations in Real Estate Transactions: Judicial Acceptance of the Agency Theory," 8 J. Corp. L. 361 (1983).

FAY, *J.*, dissenting: I respectfully dissent herein for the same reasons I dissented in *Roccaforte v. Commissioner*, 77 T.C. 263, 290–291 (1981), revd. 708 F.2d 986 (5th Cir. 1983).

The Fifth Circuit in *Roccaforte v. Commissioner*, 708 F.2d at 989–990, agreed with my interpretation of *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 437 (1949), that a true corporate agency cannot exist when the corporation-partnership relations are dependent on the partners' ownership and control of the corporation.

Since the majority opinion herein, as in *Roccaforte*, finds that the relations between the corporation and partnership were dependent on the fact that the corporation was owned and controlled by the partners, I would again hold that, for tax purposes, the corporation was not a mere agent of the partnership.

GOFFE, WILBUR, and CHABOT, *JJ.*, agree with this dissent.

---

COHEN, *J.*, dissenting: I respectfully dissent.

The facts of this case are far from unusual. Petitioner was a member of a partnership engaged in the real estate business and sought construction financing in order to develop an office building. He, not unlike innumerable other business persons in a variety of other businesses, found that the usury laws of the jurisdiction in which the building was to be constructed were not consistent with commercial reality. He, not unlike innumerable other business persons in a variety of other businesses, found a way around the local usury laws. As set forth in the stipulation:

12. At the time involved, the District of Columbia Code made a loan at a rate exceeding eight percent (8%) to non-corporate borrowers usurious. D.C. Code, Title 28, sec. 3301. That prohibition was inapplicable to loans to corporations. D.C. Code, Title 29, sec. 904(h).

13. The partnership of Donohoe and Ourisman could not borrow the funds required to construct the office building under the loan commitment without raising usury problems.

14. Wisconsin-Jennifer, Inc. (the "Corporation") was formed by Donohoe and Ourisman on February 5, 1970. * * *

15. AS & T advised Donohoe and Ourisman that it would be necessary for record title to the leasehold to be held by its borrower, here a corporation.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

17. Immediate reconveyance of the leasehold to Associates after the construction loan closed on May 7, 1970, was believed by the parties not to be practical under the District of Columbia usury law because the loan called for periodic advances as construction proceeded. Each advance of funds in a construction loan is treated as a separate loan transaction; accordingly, it was necessary that title to the leasehold be in the name of the Corporation at the time of each advance. Moreover, reconveyance with each advance would have created what the parties believed to be a highly impractical situation in which it would have been necessary to assign and reassign the leasehold with each recurring advance of funds. * * *

Not unlike innumerable other businesses, petitioner's office building venture incurred losses in the initial years. Unlike many of those other businesses, however, petitioner's corporation could not maintain the requirements established by Congress as embodied in subchapter S of the Internal Revenue Code, which are necessary for a corporation to pass losses through to its shareholders. The corporation's receipt of "passive investment income," i.e., rents, would soon effect a termination of any subchapter S election. Sec. 1372(e)(5) during the years in issue, now sec. 1362(d)(3); see *Howell v. Commissioner*, 57 T.C. 546, 556 (1972). But now petitioner and the majority have avoided the limitations established by Congress just as neatly as petitioner and his partner avoided the local usury laws.

The majority opinion (page 177) quotes from the U.S. Supreme Court opinion in *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438–439 (1943). The language quoted, it seems to me, when combined with the stipulated facts quoted above, compels the conclusion that petitioner's corporation was a separate taxable entity. The corporation was formed for a business purpose and served that purpose by taking and maintaining title to property. Other cases cited below confirm my conclusion. My main reason for dissent, however, is expressed in the portion of the *Moline Properties* opinion immediately following the portion quoted by the majority, to wit:

In *Burnet v. Commonwealth Improvement Co.*, 287 U.S. 415, [53 S.Ct. 198, 77 L.Ed. 399] this Court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for purposes of his own. The choice of the advantages of incorporation to do business, it was held, required the acceptance of the tax disadvantages.

In *National Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949), the Supreme Court stated that its opinion did "not foreclose a true corporation agent or trustee from handling the property and income of its owner-principal without being taxable therefor." (336 U.S. at 437, majority opinion page 178.) That language, regardless of whether the factors to be considered are six factors of equal weight or four factors and two essential criteria, does not compel a holding of agency in inappropriate circumstances. It anticipates cases where the corporation serves as agent for unrelated taxpayers as well as its shareholders, such as those cited by the majority opinion at page 179–180.

In *Strong v. Commissioner*, 66 T.C. 12, 24–26 (1976) (Court reviewed), affd. 553 F.2d 94 (2d Cir. 1977), and cited with apparent reaffirmation by the majority (page 187), this Court stated:

> In short, a corporate "straw" may be used to separate apparent from actual ownership of property, without incurring the tax consequences of an actual transfer; but to prevent evasion or abuse of the two-tiered tax structure, a taxpayer's claim that his controlled corporation should be disregarded will be closely scrutinized. *If the corporation was intended to, or did in fact, act in its own name with respect to property, its ownership thereof will not be disregarded.* [Emphasis added.]

> \* \* \* \* \* \* \*

> Having set up a separate entity through which to conduct their affairs, petitioners must live with the tax consequences of that choice. Indeed, the very exigency which led to the use of the corporation serves to emphasize its separate existence. See *Moline Properties v. Commissioner*, 319 U.S. at 440; *David F. Bolger*, 59 T.C. at 766. Our conclusion is not based upon any failure of the petitioners to turn square corners with respondent; they consistently made clear their intention to prevent separate taxation of the corporation if legally possible. They took most precautions consistent with business exigency to achieve that end. We simply hold that their goal was not attainable in this case [*Strong v. Commissioner, supra* at 24–26. Fn refs. omitted.]

I agree with the dissent of Judge Nims in *Roccaforte v. Commissioner*, 77 T.C. 263, 291–293 (1981), revd. by the Fifth Circuit for reasons discussed in the majority opinion (pages. 184–185), in which he stated that "there is no real substantive distinction between this case and *Strong v. Commissioner*" and:

In short, I would hold that these taxpayers cannot have it both ways: either the corporation must be recognized as a viable entity engaged in business, with all the tax benefits and burdens attendant thereupon, or its relationship with the partnership must be exposed as a transparent artifice, i.e., a sham, designed solely to thwart the law of [the local jurisdiction], an effort upon which this Court should seriously reflect before lending its support.

This Court has repeatedly said that its function is not to rewrite tax laws enacted by Congress. A fortiori, we should not decide cases as an accommodation to a perceived unfortunate effect of nontax oriented local laws. I see no reason to depart from the principles of those cases that hold that the taxpayer must take the chaff with the wheat, or, if you will, with the straw.

GOFFE, WILBUR, CHABOT, and NIMS, *JJ.*, agree with this dissent.